PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

US AIRLINE PILOTS ASSOCIATION,

*Plaintiff-Appellant,*

v.

AWAPPA, LLC; JOHN MCILVENNA;
MITCH VASIN; PETER BLANDINO;
ERIC FERGUSON; JEFF KOONTZ; RUSS
PAYNE; KEITH KRUEGER; ERIC
AUXIER; CHRISTOPHER CUNDARI;
JACK TOOKE; DAVID BRAID; ROBERT
J. NARLOCH; BRUCE A. HANNAH;
RON GABALDON; SHAWN METZKER;
JURIE MAREE; JOHN DOES 1-100;
AL CASBY; JEFF ABBOTT; MARK
DOYAL; LARRY DIEHL; STEVE
TRIMMER; CJ SZMAL; JOE HEIL;
KEVIN STEELE,

No. 08-1858

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Martin K. Reidinger, District Judge.
(3:08-cv-00246-MR-CH)

Argued: March 23, 2010

Decided: July 30, 2010

Before MICHAEL, MOTZ, and KING, Circuit Judges.

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Michael and Judge King joined.

---

## COUNSEL

**ARGUED**: Lee R. A. Seham, SEHAM, SEHAM, MELTZ & PETERSEN, LLP, White Plains, New York, for Appellant. John Miller West, BREDHOFF & KAISER, PLLC, Washington, D.C., for Appellees. **ON BRIEF:** Nicholas Paul Granath, SEHAM, SEHAM, MELTZ & PETERSEN, LLP, Minneapolis, Minnesota, Stanley J. Silverstone, Lucas Middlebrook, SEHAM, SEHAM, MELTZ & PETERSEN, LLP, White Plains, New York, for Appellant. Lat J. Celmins, Patrick J. Van Zanen, Michael L. Kitchen, MARGRAVE CELMINS, P.C., Scottsdale, Arizona, for Appellees Keith Krueger, Eric Auxier, Christopher Cundari, Jack Tooke, David Braid, Robert Narloch, Bruce Hannah, Ron Gabaldon, Shawn Metzker, Al Casby, Larry Diehl, CJ Szmal, Joe Heil, and Kevin Steele; Jeffrey R. Freund, BREDHOFF & KAISER, PLLC, Washington, D.C., for Appellees AWAPPA, LLC, John McIlvenna, Mitch Vasin, Peter Blandino, Eric Ferguson, Jeff Koontz, and Russ Payne.

---

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

The US Airline Pilots Association ("USAPA") filed this action against the America West Airlines Pilots Protective Alliance, LLC ("AWAPPA") and several individual defendants pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68 (2006). The complaint, which seeks an injunction and damages, alleges that the defendants engaged in extortionate acts that constitute a pattern of racketeering activity. The district court granted

the defendants' motion to dismiss the complaint for failure to state a federal claim and thus lack of subject-matter jurisdiction. USAPA appeals, and we affirm.

I.

The facts, as set forth in USAPA's First (and repeated in the proposed Second) Amended Complaints, are as follows:

On May 19, 2005, US Airways, Inc. and America West Airlines ("AWA") merged to form US Airways, Inc. ("US Airways"). In the airline industry, pilot compensation and benefits depend in large part on seniority, and the newly merged company sought to integrate the two constituent carriers' pilots on the basis of seniority. To that end, the Air Line Pilots Association ("ALPA"), the union representing both groups of pilots at the time of the merger, worked to prepare an integration proposal for submission to US Airways.

Negotiations between the two pilot groups floundered because, on average, pilots from the former US Airways, Inc. ("East pilots") had an earlier date of hire than pilots from the former AWA ("West pilots"). Thus, East pilots lobbied for seniority to be determined solely by date of hire, while West pilots championed a system that would incorporate other variables, including the relative economic strength of the pre-merger carriers.

When negotiations stalled, ALPA forced the two groups into arbitration. On May 1, 2007, Arbitrator George Nicolau issued an award ("the Nicolau Award") that rejected a pure date-of-hire system (and therefore favored the West pilots). The Nicolau Award could have no binding effect until the merged carrier adopted it as its integration policy, so East pilots lobbied against (and West pilots lobbied for) its submission to US Airways as ALPA's official proposal. Although

the fight over the Nicolau Award raged without solution, ALPA ultimately presented it to US Airways.[1]

Several East pilots, dissatisfied with ALPA's representation, formed USAPA in order "to replace ALPA as the collective bargaining representative of the pilots at the combined US Airways." The National Mediation Board called for an election to allow the pilots to choose between USAPA and ALPA. USAPA campaigned on a platform of date-of-hire-based seniority. In response, several West pilots formed AWAPPA to support ALPA's candidacy, allegedly "to oppose USAPA and its goal of date of hire seniority integration." USAPA defeated ALPA in the election, and on April 18, 2008, the National Mediation Board certified USAPA as the new collective bargaining representative of US Airways's pilots. *In re Representation of Employees of US Airways Pilots*, 35 N.M.B. 135 (2008).

USAPA alleges that, after the election, "the leaders of AWAPPA issued a press release, stating that AWAPPA had been formed to engage in an 'aggressive strategy' against USAPA, and further stating that 'USAPA's demise is just a matter of time.'" USAPA asserts that "[s]ince [its] certification . . . , [AWAPPA and its] co-conspirators have subjected USAPA, its officers, and individual US Airways pilots to a concerted campaign of extortion and sabotage." According to USAPA, in an effort to destroy it, AWAPPA has clogged USAPA's toll-free hotline with frivolous phone calls; used "profane, indecent, vulgar and threatening language in telephone voicemail messages to USAPA, its officers, and individual US Airways pilots;" made other threatening and harassing communications; conspired to "create a mass violation of the contractual dues obligation" to USAPA, in violation of the collective bargaining agreement; filed frivolous grievances; increased USAPA's mail costs; prevented East

---

[1]As of the filing of USAPA's First Amended Complaint, US Airways had not implemented the Nicolau Award's recommended seniority list.

pilots from using the "jump seat[s]" on airplanes in order to commute to work; and interfered with USAPA's e-mail communications through spamming. One person posted on the AWAPPA online message board that "[w]e'll be playing this game for 10 years or until ALPA is back on property."

On May 30, 2008, USAPA brought this action against AWAPPA and several of its members, asserting RICO violations and state-law claims including civil conspiracy and defamation, and seeking injunctive relief and damages. The complaint alleges that the

> [d]efendants and their co-conspirators seek to destroy USAPA in order to compel the implementation of the Nicolau Award and to deprive USAPA of its statutory right . . . to negotiate terms and conditions of employment, and otherwise provide representation services, for the US Airways pilots. In so doing, defendants and their co-conspirators seek, *inter alia*, to obtain pecuniary benefits for America West pilots that would otherwise be distributed to all US Airways pilots on a date of hire seniority basis.

USAPA asserts that the defendants "also seek to deprive USAPA of dues/agency fee revenue . . . and divert these monies to AWAPPA."

The district court dismissed the complaint for failure to state a federal claim, and therefore for lack of subject-matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1) and (b)(6). *US Airline Pilots Ass'n v. Awappa, LLC*, No. 3:08cv246, 2008 WL 2761388, at *14-15 (W.D.N.C. July 11, 2008). The court declined to exercise supplemental jurisdiction over USAPA's state-law claims, denied as futile USAPA's motion to amend its complaint, and denied as moot USAPA's request for injunctive relief. *Id.* at *15-18.

USAPA timely filed this appeal.

II.

We review de novo a district court's dismissal for failure to state a claim. *See Anderson v. Sara Lee Corp.*, 508 F.3d 181, 188 (4th Cir. 2007). In doing so, "we must accept as true all of the factual allegations contained in the complaint." *Id.* (internal quotation marks omitted). To survive a motion to dismiss, a complaint need not provide "detailed factual allegations," but it must "provide the grounds of [the plaintiff's] entitlement to relief" with "more than labels and conclusions" and more than "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and alterations omitted). Ultimately, "[f]actual allegations must . . . raise a right to relief above the speculative level," and the complaint must offer "enough fact to raise a reasonable expectation that discovery will reveal evidence" of the alleged activity. *Id.* at 555, 556.

RICO, the federal claim at issue, "does not cover all instances of wrongdoing. Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006). The Supreme Court has described the penalties authorized by RICO as "drastic." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 233 (1989). Indeed, in a civil RICO action, a successful plaintiff may recover not only costs and attorney's fees, but also *treble* damages. *See* 18 U.S.C. § 1964(c). These penalties are primarily designed to provide society with a powerful response to the dangers of organized crime. *See H.J. Inc.*, 492 U.S. at 245. Thus, although we read the terms of the statute "liberally" in order to "effectuate its remedial purposes," *Boyle v. United States*, 129 S. Ct. 2237, 2243 (2009) (internal quotation marks omitted), we must also exercise caution

> to ensure that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions;

that treble damage suits are not brought against isolated offenders for their harassment and settlement value; and that the multiple state and federal laws bearing on transactions . . . are not eclipsed or preempted.

*Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683 (4th Cir. 1989).

To state a civil RICO claim, a plaintiff must allege that the defendants engaged in, or conspired to engage in, a "*pattern* of racketeering activity." 18 U.S.C. § 1962 (emphasis added). "Racketeering activity" includes "extortion," defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Id.* §§ 1951(b)(2) (defining extortion), 1961(1) (defining "racketeering activity" to include the offenses enumerated in § 1951). USAPA claims that the defendants violated § 1962(c) and (d) by engaging in (and conspiring to engage in) a pattern of extortion.

The district court dismissed USAPA's complaint for failure to state a claim on two alternative grounds. First, the court held that the complaint did not allege extortion as a matter of law, and therefore USAPA had failed to allege a predicate offense necessary to show "racketeering activity." *US Airline Pilots Ass'n*, 2008 WL 2761388, at *13-14. Alternatively, the court held that the activities described in the complaint did not establish a "pattern." *Id.* at *14-15. We need not address the first ground because the law clearly dictates affirmance on the second.

### III.

A "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of [the RICO statute] and the last of which occurred within ten years . . . after the commission of a prior

act of racketeering activity." 18 U.S.C. § 1961(5). To demonstrate a *pattern* of such activity, the plaintiff must show "continuity plus relationship," i.e., "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc.*, 492 U.S. at 239 (emphasis and internal quotation marks omitted). Although USAPA does allege acts that relate to one another—sharing the same purpose, participants, and victims—it fails to allege the "continuing racketeering activity" necessary to state a RICO claim. *See id.* at 240.

RICO's continuity requirement—"centrally a temporal concept"—arises from Congress's concern with "long-term criminal conduct." *Id.* at 242. As such, it demonstrates Congress's desire to limit RICO's application to "ongoing unlawful activities whose scope and persistence pose a special threat to social well-being." *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) (internal quotation marks omitted); *see also Vemco, Inc. v. Camardella*, 23 F.3d 129, 133-34 (6th Cir. 1994).

The Supreme Court has explained that "'[c]ontinuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. Closed-ended continuity exists when the "series of related predicates extend[s] over a substantial period of time." *Id.* at 242. USAPA does not contend that the factual allegations in any of its complaints, describing conduct spanning only a few weeks, satisfy the Supreme Court's standard for closed-ended continuity.

USAPA does maintain, however, that it has set forth facts adequately alleging open-ended continuity. To allege open-ended continuity, a plaintiff must plead facts that demonstrate a "threat of continuity," i.e., facts that give rise to a reasonable expectation that the racketeering activity will "extend[ ] indefinitely into the future." *Id.* "Whether the predicates proved

establish a threat of continued racketeering activity depends on the specific facts of each case." *Id.*

   A plaintiff cannot demonstrate open-ended continuity if the racketeering activity has a "built-in ending point, and the case does not present the necessary threat of long-term, continued criminal activity." *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 549 (4th Cir. 2001); *see also Menasco*, 886 F.2d at 684 (finding no continuity because "[d]efendants' actions were narrowly directed towards a single fraudulent goal"); *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 186 (2d Cir. 2008) (holding "a serious, but discrete and relatively short-lived scheme . . . insufficient to establish open-ended continuity" (internal quotation marks omitted)); *Gamboa*, 457 F.3d at 708 (holding that a "one-time endeavor to wreak havoc upon all matters linked to a single murder investigation" had a "built-in end point" and thus lacked continuity); *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000) ("Had Efron argued that the defendants planned to operate the hotel indefinitely at a paper loss as a means of perpetually defrauding him, rather than asserting the specific objective of squeezing him out of the Partnership, he would have a stronger argument for an open-ended RICO pattern. His pleadings and argument, however, depict an undertaking with a soon-to-be reached endpoint.").[2]

   USAPA's claim fails because it alleges that the defendants have engaged in racketeering activity in order to achieve a single goal: "to destroy USAPA and render it incapable of

---

   [2]Many of these cases concern the predicate act of fraud. *See, e.g.*, *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 181 & n.15 (4th Cir. 2002); *GE Inv. Partners*, 247 F.3d at 549. Clearly, however, the general continuity principles apply to *all* RICO predicate acts, including extortion. *See H.J. Inc.*, 492 U.S. at 242 (using an example of extortion to illustrate open-ended continuity); *see also Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1264 (D.C. Cir. 1995) (finding no open-ended continuity in a scheme allegedly involving "bribery, extortion, wire and mail fraud, and interstate travel in aid of racketeering activity").

discharging its legal duty to represent the US Airways pilots." First and Second Amended Compls. ¶ 53; *id.* ¶ 147 (stating that the purpose of the extortion campaign "was to destroy USAPA and to obtain from USAPA the right to represent the pilots of US Airways"); *id.* ¶ 148 (alleging that the defendants' racketeering acts aimed "to destroy USAPA and to obtain property from USAPA"). This objective creates a foreseeable "built-in ending point" that is closely related to the extortion and thus precludes open-ended continuity; once the defendants replace USAPA, the scheme will end. *See, e.g.*, *GE Inv. Partners*, 247 F.3d at 549 (finding no continuity in a scheme "designed for the single goal" of fraudulently inflating the value of and then selling the defendants' controlling interest in a company); *Giuliano v. Fulton*, 399 F.3d 381, 391 (1st Cir. 2005) (holding that the complaint did not allege open-ended continuity because "[o]nce achieved, the illegal scheme . . . would end").

In its reply brief, USAPA argues that we should overlook the limit inherent in these allegations and instead read the complaint to allege that the defendants will continue their extortionate activity until US Airways "implement[s]" the Nicolau Award. Reply Br. at 26-27. USAPA contends that its "allegations . . . logically require" continuity because "[i]mplementing Nicolau is a goal that necessarily includes bargaining for a new contract, ratification, execution, and continuing exercise of union-representation rights necessary to keep the demanded terms in succeeding contracts, in perpetuity." *Id.* Even if the controlling union had the power to "implement" the Nicolau Award, which of course it does not given that the carrier must agree to employment terms, this argument also fails.

An extortion campaign aimed at implementing the Nicolau Award might last a long time, but it clearly has a "built-in ending point" precluding open-ended continuity. That is, the union's endorsement of the Nicolau Award, and the carrier's subsequent implementation of it, would end the fight, and

therefore end the extortion. USAPA offers only speculation in its appellate brief—not factual allegations in its complaint—in support of its view that the defendants would indefinitely extort the controlling union *after* US Airways entered into a union contract of the sort the defendants seek, i.e., one incorporating the Nicolau Award. As courts have regularly held,

> when . . . a complaint explicitly presents a distinct and non-reoccurring scheme with a built-in termination point and provides no indication that the perpetrators have engaged or will engage in similar misconduct, the complaint does not sufficiently allege continuity for § 1962(c) purposes even if the purported scheme takes several years to unfold, involves a variety of criminal acts, and targets more than one victim.

*Gamboa*, 457 F.3d at 709-10 (collecting cases).

The "built-in ending point" in this case distinguishes it from the only concrete example of open-ended continuity the Supreme Court has recognized: the "hoodlum" who appears monthly to collect "insurance" payments that "cover [business owners] against breakage of their windows." *H.J. Inc.*, 492 U.S. at 242. In that situation, even if the business owner submitted to the extortionist's demands and delivered payment, the extortion would continue, month after month. Unlike the allegations with respect to the "hoodlum," USAPA simply has not alleged that the defendants' extortion campaign threatens *indefinite* repetition.[3]

---

[3]USAPA alleges in its proposed Second Amended Complaint that the predicate acts constitute the defendants' "regular way of doing business," one of the recognized approaches to showing open-ended continuity. *See H.J. Inc.*, 492 U.S. at 242. Because the "very nature of the [extortion is] such that [the d]efendants could not continue the [extortion] beyond a limited period of time," this argument also fails. *GE Inv.*, 247 F.3d at 550; *see also Howard v. Am. Online Inc.*, 208 F.3d 741, 750 (9th Cir. 2000) (holding that alleged acts did not constitute defendant's "regular way of doing business" because the "[p]laintiffs present[ed] no facts indicating that [the fraud] would continue into the future").

It is no surprise, then, that the conduct USAPA alleges closely resembles conduct we have found not to demonstrate continuity after *H.J. Inc*. *See, e.g.*, *GE Inv. Partners*, 247 F.3d at 549 (finding no continuity where the defendants' "single goal" was to fraudulently inflate the value of and then sell their controlling interest in a company); *Menasco*, 886 F.2d at 684 (finding no continuity where "[d]efendants' actions were narrowly directed towards a single . . . goal," "involved but one set of victims," and took place over a relatively short period of time).

Because the appropriate "commonsensical, fact-specific" examination of the allegations in USAPA's complaint fails to yield a pattern of racketeering activity, USAPA has failed to state a cognizable RICO claim. *See Menasco*, 886 F.2d at 684. Accordingly, the district court did not err in granting the defendants' motion to dismiss the complaint.

IV.

We can quickly dispose of USAPA's remaining contentions—that the district court erred in denying it leave to amend its complaint and in refusing to grant it injunctive relief.

"We review the district court's denial of leave to amend the complaint for an abuse of discretion." *GE Inv. Partners*, 247 F.3d at 548. The district court does not abuse its discretion in denying leave when "amendment would be futile." *Id.* Having reviewed the proposed amendments, we conclude that they would have no impact on the outcome of the motion to dismiss. Thus, the district court did not abuse its discretion.

We also review the grant or denial of injunctive relief for an abuse of discretion. *See Muffley ex rel. NLRB v. Spartan Mining Co.*, 570 F.3d 534, 543 (4th Cir. 2009). Because USAPA's complaint failed to state a claim upon which relief could be granted, the district court did not err in denying

USAPA's request for a temporary restraining order and preliminary injunction. *See Gold v. Feinberg*, 101 F.3d 796, 802 (2d Cir. 1996).

## V.

The judgment of the district court is

*AFFIRMED*.