**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-1672**

UNITED STATES EX REL. MIKE AHUMADA,

             Plaintiff – Appellant,

and

ERIC H. HOLDER, JR., Attorney General,

             Plaintiff,

        v.

NISH; GREEN BAY PACKAGING INC.; INTERNATIONAL PAPER COMPANY, INCORPORATED; SMURFIT-STONE CONTAINER CORPORATION; WEYERHAEUSER COMPANY,

             Defendant – Appellees,

and

NATIONAL CENTER FOR EMPLOYMENT OF THE DISABLED, now known as ReadyOne Industries; BOB JONES, a/k/a Robert E. Jones; DOES 1-100,

             Defendants.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Senior District Judge. (1:06-cv-00713-CMH-TCB)

Argued: March 20, 2014                 Decided: June 23, 2014

Before NIEMEYER and DIAZ, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by published opinion.  Judge Diaz wrote the opinion, in which Judge Niemeyer and Senior Judge Hamilton joined.

---

**ARGUED:** Martin E. Restituyo, LAW OFFICES OF MARTIN E. RESTITUYO, New York, New York, for Appellant.  Robert Carton Weaver, Jr., GARVEY SCHUBERT BARER, Portland, Oregon; Matthew Allen Fitzgerald, MCGUIREWOODS, LLP, Richmond, Virginia, for Appellees.  **ON BRIEF:** Victor M. Glasberg, VICTOR M. GLASBERG & ASSOCIATES, Alexandria, Virginia; Mark C. Rifkin, WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP, New York, New York, for Appellant.  Charles William McIntyre, Jr., Franklin Darley Annand, Washington, D.C., Jeremy S. Byrum, MCGUIREWOODS, LLP, Richmond, Virginia; Seth A. Rosenthal, Washington, D.C., Michael Wayne Robinson, VENABLE, LLP, Tysons Corner, Virginia; John Francis Henault, Jr., PERKINS COIE, LLP, Washington, D.C.; Paul H. Trinchero, Benjamin J. Lambiotte, GARVEY SCHUBERT BARER, Portland, Oregon; Lynn F. Jacob, WILLIAMS MULLEN, P.C., Richmond, Virginia, for Appellees.

---

DIAZ, Circuit Judge:

Mike Ahumada, as relator, filed this qui tam action on behalf of the United States under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 et seq.  In his first amended complaint, Ahumada alleges that his former employer, the National Center for Employment of the Disabled ("NCED"), along with other defendants, defrauded the government through various schemes in connection with contracts pursuant to the Javits-Wagner-O'Day Act, 41 U.S.C. §§ 8501 et seq.  Specifically, Ahumada alleges that NCED conspired with its suppliers and an overseeing nonprofit to skirt applicable regulations and overcharge the government.

After NCED and its former CEO settled, the district court dismissed Ahumada's claims against the remaining defendants.  It held that the FCA's public-disclosure bar precluded subject-matter jurisdiction and that Ahumada had not stated any viable claims.  Ahumada now appeals that dismissal, as well as the district court's denial of his motion for leave to file a second amended complaint.  For the reasons that follow, we affirm.

I.

A.

From February to July of 2004, NCED employed Ahumada as a Vice President and General Manager.  NCED, a nonprofit

corporation, produces a number of products--including military apparel and corrugated boxes--that it sells to agencies of the U.S. government.  These sales occur pursuant to contracts under the Javits-Wagner-O'Day Act.

The Javits-Wagner-O'Day Act establishes a government contracting program (the "JWOD program") to promote "employment and training opportunities for persons who are blind or have other severe disabilities."  41 C.F.R. § 51-1.1(a).  To that effect, the Act created the Committee for Purchase from People who are Blind or Severely Disabled (the "Committee"), which makes and maintains a "procurement list" of products and services eligible for purchase from "qualified nonprofit agencies."  41 U.S.C. §§ 8502, 8503.  If "[a]n entity of the Federal Government intend[s] to procure a product or service on the procurement list," it must do so from such a nonprofit at a market price established by the Committee.  Id. § 8504.  To qualify for participation in the program, a nonprofit must certify, on an annual basis, that it "employs blind or other severely disabled individuals for at least 75 percent of the hours of direct labor required for the production or provision of the products and services."  Id. § 8501(6)(C).

To coordinate the participation of nonprofits, the Committee appointed the National Industries for the Severely Handicapped ("NISH") to serve as the JWOD program's "central

4

nonprofit agency." See id. § 8503(c). In this role, NISH was responsible for "[e]valuat[ing] the qualifications" of other nonprofits that sought to participate in the program, and for assigning them contracts "in a fair and equitable manner." 41 C.F.R. §§ 51-3.2(b), 51-3.4. NISH was also charged with "monitor[ing]" the participating nonprofits to ensure their compliance with "the statutory and regulatory requirements [of] the program." Id. § 51-3.2(j).

Beginning in October 2005--about eight months before Ahumada filed his initial complaint in this case--The Oregonian, a Portland-based newspaper, published a series of articles describing questionable practices within the JWOD program. Among other issues, the articles alleged that NCED was receiving payment on JWOD contracts despite failing to employ the requisite percentage of disabled workers. The articles attributed at least some of the problems in the program to lax oversight by NISH.

The El Paso Times published the first in a similar series of articles that November. Its articles reported that the Committee had begun investigating NCED for its perceived lack of compliance with JWOD labor requirements. The articles further alleged that certain NCED suppliers, including International Paper Co. ("IPC"), Green Bay Packaging, Inc., and Smurfit-Stone Container Corp., helped NCED skirt JWOD regulations by providing

5

NCED with finished products rather than component parts. See 41 C.F.R. § 51-4.4(d) (prohibiting JWOD-participating nonprofits from "subcontract[ing] the entire production process for all or a portion of an order without the Committee's prior approval"). The articles reported that NCED then resold these products to the government under the pretense that they were produced entirely by disabled NCED employees. The allegations reported in the two newspapers were also the subject of a television documentary.

In the wake of this publicity, the FBI launched a criminal investigation that resulted in the indictments of three NCED executives. Bob Jones and Patrick Woods--NCED's former CEO and former Board President--ultimately pleaded guilty to various fraud and embezzlement charges. In 2010, a jury convicted NCED's former COO, Ernie Lopez, of making false statements and conspiracy to defraud the government.

B.

On June 20, 2006, Ahumada filed this qui tam suit under the FCA against NCED, Jones, and one-hundred John Doe defendants in the U.S. District Court for the Eastern District of Virginia. The complaint alleged that, between 1999 and 2006, Jones and NCED engaged in a series of schemes to defraud the government, primarily by receiving payments on JWOD contracts despite failing to comply with JWOD regulations. Ahumada later filed a

6

first amended complaint alleging that NCED: (1) falsely represented its compliance with JWOD's disabled-labor requirements; (2) falsely represented that it produced certain products it sold to the government; and (3) overcharged the government.

The first amended complaint also named several additional defendants, including NISH and four NCED suppliers: IPC, Green Bay, Smurfit, and Weyerhaeuser Co. (collectively, the "supplier defendants"). Ahumada alleged that NISH knew that NCED was not complying with JWOD requirements but continued to assign it contracts to improve NISH's own bottom line. He also alleged that the supplier defendants conspired with NCED and facilitated its fraud by issuing artificially inflated invoices, and, later, providing rebates; falsely billing NCED for raw materials despite actually providing finished or nearly finished products; and falsely stamping finished products with NCED's box manufacturing certificate. According to Ahumada, the supplier defendants engaged in this conduct while knowing--and attempting to conceal--that NCED was not complying with JWOD regulations.

Per its statutory mandate, the United States intervened in Ahumada's suit with respect to defendants NCED and Jones. See 31 U.S.C. § 3730(b)(2). Both eventually settled with the government and Ahumada. The United States chose not to intervene with respect to the claims against NISH and the

7

supplier defendants, and those parties moved to dismiss Ahumada's suit.

In support of their motions to dismiss, NISH and the supplier defendants advanced two primary arguments. First, they argued that the district court lacked subject-matter jurisdiction pursuant to the FCA's "public-disclosure bar." See 31 U.S.C. § 3730(e)(4)(A) (2006). This provision precludes subject-matter jurisdiction over claims "based upon" publicly disclosed allegations unless the relator is an "original source." Id. Second, they argued that the first amended complaint suffered from various pleading defects. In response, Ahumada moved for leave to file a proposed second amended complaint.

The district court granted the defendants' motions to dismiss. See United States ex rel. Ahumada v. Nat'l Ctr. for Emp't of the Disabled, No. 1:06-cv-713, 2013 WL 2322836 (E.D. Va. May 22, 2013). The court held that the first amended complaint was "devoid of any particularized facts" and therefore failed to plead fraud with the particularity required by Federal Rule of Civil Procedure 9(b). Id. at *3-*4. Specifically, it did not identify the "who, what, when, where and how" of the alleged false claims. Id. at *3 (internal quotation marks omitted). The court also held that the first amended complaint's "general[]" and "conclusory" allegations were

8

insufficient because they adequately alleged neither scienter--"an essential element of any FCA claim"--nor the specific elements of a conspiracy. Id. at *4.

As an alternative basis for dismissal, the court held that the public-disclosure bar deprived it of subject-matter jurisdiction. In the court's view, "[t]he allegations [in the first amended complaint] clearly track the news media stories [which] appear[] to be the basis of [Ahumada's] claim." Id. at *6. Furthermore, the court held that Ahumada had not established that he was an "original source"--so as to avoid the public-disclosure bar--because he failed to demonstrate that he possessed "direct and independent knowledge" of the information underlying the allegations. Id.

Finally, the district court denied Ahumada leave to amend. It explained that the proposed amendments "fail[ed] to cure the deficiencies . . . in the [first amended complaint]" and were therefore futile. Id. at *7. Because "[t]he specific details added to the [second amended complaint] [were] all information that c[ould] be found in the public domain," the court determined that the new pleading was "likewise based upon a public disclosure." Id.

Ahumada appealed, and we exercise jurisdiction pursuant to 28 U.S.C. § 1291.

9

II.

Although Ahumada nominally challenges the district court's order dismissing the first amended complaint, his arguments on appeal center on the sufficiency of the allegations in the second. In essence, rather than directly challenge the district court's dismissal of the first amended complaint, Ahumada argues that the district court should have granted him leave to amend, which he contends would have cured any pleading or jurisdictional defects. We thus consider the issues presented by this appeal solely through the prism of Ahumada's proposed second amended complaint, ultimately seeking to determine whether the district court erred in concluding that it was futile.

Generally, we review a district court's denial of a motion for leave to amend for abuse of discretion. See US Airline Pilots Ass'n v. Awappa, LLC, 615 F.3d 312, 320 (4th Cir. 2010). But where, as here, the district court denied such a motion on grounds of futility, we employ the same standard that would apply to our review of a motion to dismiss. See Pollard v. Pollard, 325 F. App'x 270, 272 (4th Cir. 2009); see also Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 132 (1st Cir. 2006). Thus, we review de novo the district court's legal conclusion that Ahumada's proposed amendments "fail[ed] to cure the deficiencies . . . in the [first amended complaint]": namely,

10

that the complaint failed to state a claim on which relief could be granted and failed to overcome the FCA's public-disclosure bar.[1]  See Ahumada, 2013 WL 2322836, at *7.

                              III.

We first consider whether the FCA's public-disclosure bar rendered the second amended complaint futile by precluding subject-matter jurisdiction.  We hold that the public-disclosure bar deprived the district court of jurisdiction over the claims against all of the appellees except Weyerhaeuser.

                               A.

At the time Ahumada filed this action, the FCA's public-disclosure bar provided that "[n]o court shall have jurisdiction over an action under [the FCA] based upon the public disclosure of allegations or transactions . . . unless . . . the person bringing the action is an original source of the information."[2] 31 U.S.C. § 3730(e)(4)(A) (2006).  Qualifying public disclosures

---

[1] We review any factual findings underlying the district court's analysis of the public-disclosure bar--a jurisdictional defense--for clear error.  See United States ex rel. Rostholder v. Omnicare, Inc., 745 F.3d 694, 699 (4th Cir. 2014).

[2] Congress amended the public-disclosure bar in 2010, but those amendments are not retroactive.  The prior version of the statute applies to this action because it was filed before the amendments' enactment.  See United States ex rel. May v. Purdue Pharma L.P., 737 F.3d 908, 915-16 (4th Cir. 2013) (citing Graham Cnty. Soil & Water Cons. Dist. v. United States ex rel. Wilson, 559 U.S. 280, 283 n.1 (2010)).

11

include those "from the news media" or "a criminal, civil, or administrative hearing," among others. Id. Once a defendant files a motion to dismiss based on the public-disclosure bar, the relator bears the burden of proving by a preponderance of the evidence that the bar does not apply. See United States ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 348 (4th Cir. 2009).

"Under this Court's precedent, a qui tam action is based upon publicly disclosed allegations only if the qui tam plaintiff's allegations were actually derived from the public disclosure itself." United States ex rel. Rostholder v. Omnicare, Inc., 745 F.3d 694, 699 (4th Cir. 2014) (internal quotation marks omitted). This stands in contrast to the broader tests applied by our sister circuits, which generally consider allegations to be "based upon" a public disclosure if they "were 'supported by' or 'substantially similar' to fraud that had been publicly disclosed." United States ex rel. May v. Purdue Pharma L.P., 737 F.3d 908, 918 (4th Cir. 2013); see also United States ex rel. Ondis v. City of Woonsocket, 587 F.3d 49, 57 (1st Cir. 2009) ("[T]he Fourth Circuit [is] alone among the courts of appeals in favoring a narrow reading of the 'based upon' language."). Notably, the public-disclosure bar "encompasses actions even partly based upon"--i.e., partly derived from--public disclosures. See Vuyyuru, 555 F.3d at 350-51 (emphasis added).

12

We easily conclude that Ahumada's allegations are at least partly based upon public disclosures. Ahumada barely argues otherwise in his opening brief, stating in just a single sentence that his "action is <u>not</u> based upon any public disclosure" because "the <u>only</u> evidence in the record . . . is that Ahumada has relied only upon his own personal knowledge." Appellant's Br. at 17. To the contrary, however, the second amended complaint itself plainly relies on public disclosures. It explicitly references reporting from <u>The Oregonian</u> and <u>El Paso Times</u>, and many of Ahumada's allegations "appear to have been lifted almost verbatim from" the various articles.[3] <u>See</u> <u>Ahumada</u>, 2013 WL 2322836, at *6. Moreover, several of the essential allegations constitute little more than direct citations to testimony from the Lopez trial. Because that information, at a minimum, appears to "actually derive" from public disclosures, <u>see</u> <u>Rostholder</u>, 745 F.3d at 699, we have no reason to disturb the district court's factual finding that

---

[3] Ahumada asserts that the references to the two newspapers are inconsequential because he was in fact the newspapers' source. But even if this is true, he does not seem to have been their <u>only</u> source. In any event, Ahumada's repeated reliance on testimony from the Lopez trial (at which Ahumada did not testify) is alone sufficient for us to conclude that the allegations in the second amended complaint are at least partly based upon a public disclosure.

13

public disclosures at least partly form "the basis of [Ahumada]'s claim," see Ahumada, 2013 WL 2322836, at *6.

### B.

Even though his action is partly "based upon" public disclosures, Ahumada may nevertheless avoid the public-disclosure bar if he is an "original source" of the allegations. See 31 U.S.C. § 3730(e)(4)(A) (2006); see also Rockwell Int'l Corp. v. United States, 549 U.S. 457, 467 (2007) (describing original-source status as an "exception" to the public-disclosure bar). To qualify as an original source, a relator must establish that he (1) has "direct and independent knowledge of the information on which the allegations are based"; and (2) "has voluntarily provided the information to the Government before filing [the] action." 31 U.S.C. § 3730(e)(4)(B) (2006).

### 1.

Considering the second requirement first, we conclude that Ahumada has adequately established that he reported his allegations to the government prior to filing suit. In an affidavit he submitted in response to the defendants' motions to dismiss, Ahumada averred that, "around January 2006," he met with FBI agent Steve Chambers and "told him everything [he] knew about all of the defendants." J.A. 578. Similarly, the second amended complaint itself alleges that, in an April 2006 meeting with Chambers and agent Tom Murray, Ahumada "described in detail

14

the various schemes taking place at NCED that were being used to defraud the government." Id. at 232.

Rather than question the truth of these statements, NISH and the supplier defendants object that they do not "establish that [Ahumada] discussed any allegations against NISH or any specific [supplier defendant] with the FBI."[4] Appellees' Br. at 27 n.8 (emphasis added). Similarly, they argue that "Ahumada has not shown, with the requisite particularity, that he informed the government about his specific allegations against the remaining defendants." Id. at 28 (emphasis added).

We think this asks too much. We agree that a relator may not satisfy the original-source exception's reporting requirement through an ambiguous assertion that leaves open to question whether the plaintiff actually reported information relating to any particular claim or concerning any particular defendant. But that is not the case here. Ahumada's affidavit

---

[4] NISH and the supplier defendants also note that any 2006 conversations with the FBI post-dated the publication of the initial reports in The Oregonian and El Paso Times. But a relator's report to the government need only occur "before [he] fil[ed] [the] action," not before the public disclosure. See 31 U.S.C. § 3730(e)(4)(B); see also United States ex rel. Siller v. Becton Dickinson & Co., 21 F.3d 1339, 1351 (4th Cir. 1994) (stating that the relator must "provide the information to the government before filing his qui tam action" (emphasis omitted)). But see U.S. ex rel. McKenzie v. BellSouth Telecomms., Inc., 123 F.3d 935, 942 (6th Cir. 1997) ("[A] relator must inform the government of the alleged fraud before the information has been publicly disclosed.").

15

specifically states that he told the FBI "everything [he] knew about all of the defendants." J.A. 578 (emphasis added). Read in conjunction with the second amended complaint's allegations (which of course name the defendants and outline in detail what Ahumada knew), we find nothing ambiguous about this statement. Requiring more would prove needlessly duplicative.

2.

Whether Ahumada has satisfied the original-source exception's "direct and independent knowledge" requirement is a more complicated question.

Under our case law, a "relator's knowledge is 'direct' if he acquired it through his own efforts, without an intervening agency, and it is 'independent' if the knowledge is not dependent on public disclosure." Grayson v. Adv. Mgmt. Tech., Inc., 221 F.3d 580, 583 (4th Cir. 2000). To establish that his knowledge meets this standard, a relator must "allege specific facts--as opposed to mere conclusions--showing exactly how and when" he obtained it. See United States ex rel. Hafter v. Spectrum Emergency Care, Inc., 190 F.3d 1156, 1162 (10th Cir. 1999). "A mere assertion of [direct and independent] knowledge, without adequate basis in fact and unsupported by competent proof," will not establish jurisdiction. Id. at 1163.

In applying these standards, we note that the original-source exception "does not permit . . . claim smuggling."

16

Rockwell Int'l, 549 U.S. at 476. In other words, the fact that "a relator is an original source with respect to some claim" does not confer "jurisdiction in gross" over all of his claims. Id. (emphasis added). For this reason, we separately address the source of Ahumada's knowledge with respect to his claims against each defendant.

### a. NISH

In his second amended complaint, Ahumada alleges that NISH facilitated NCED's fraud by ignoring NCED's lack of compliance with JWOD regulations. According to the complaint, NISH representatives toured NCED facilities on three occasions (in 1999, 2002, and 2005), and these visits "would have disclosed and did disclose that NCED did not employ significant numbers of severely disabled individuals." J.A. 250. Nevertheless, the complaint alleges, NISH did not bar NCED from participating in the JWOD program. Instead, NISH continued to certify NCED's compliance with JWOD labor requirements "each and every year." Id. Meanwhile, NISH's own revenues increased by at least 86 percent. Accordingly, the second amended complaint concludes, NISH "aided" NCED in "wrongfully profit[ing] from the United States." Id. at 253.

Even assuming these allegations are true, Ahumada has not established that they are based on his direct and independent knowledge. Ahumada worked at NCED for only six months in 2004,

17

so it is far from clear how he gained direct knowledge of the NISH visits in 1999, 2002, and 2005. Ahumada has offered no explanation for how he learned of these events. But nearly all of the information appears in public disclosures. Indeed, the second amended complaint itself explicitly cites testimony from the Lopez trial for at least one of its allegations against NISH.

Accordingly, without any other explanation from Ahumada, we conclude that his knowledge necessarily derives from public disclosures or some other "intervening agency." Grayson, 221 F.3d at 583. The allegations against NISH therefore do not avoid the public-disclosure bar.

### b. Green Bay

So too with the claims against Green Bay. The substance of Ahumada's allegation against Green Bay is that it produced "complete and nearly complete" products for NCED in violation of NCED's obligation to produce such products itself. See J.A. 257. According to the second amended complaint, Green Bay was aware that NCED's governments contracts "required direct labor" by disabled employees, yet it sold NCED the finished products anyway. See id. at 256-57.

As Ahumada forthrightly acknowledges, however, NCED did not place orders with Green Bay until "after [Ahumada was] terminated from employment by NCED." Id. (emphasis added). To

18

support his allegation that Green Bay provided NCED with finished products, Ahumada cites publicly disclosed testimony from the Lopez trial. See id. at 257 ("Jose Rosales, Sales Representative for Green Bay, testified at the criminal trial of Ernie Lopez that commencing in February 2006, NCED ordered a million postal sleeves from Green Bay."). Accordingly, we conclude that Ahumada is not an original source with respect to the claims against Green Bay.

### c. IPC

In contrast to Green Bay, IPC "was already making containers for NCED" at the time Ahumada began working there. Id. at 258. According to the second amended complaint, these containers came from IPC's San Antonio plant, rather than its El Paso plant, because the general manager of the El Paso plant "refused to go along with the illegal scheme of manufacturing boxes that were supposed to be made by disabled individuals." Id. Thus, Ahumada asserts, IPC "unquestionably knew that NCED was participating in the JWOD program . . . and that NCED was not meeting the JWOD requirement." Id.

To be sure, this allegation comes closer than the previous ones to establishing Ahumada's direct and independent knowledge. But it nevertheless falls short of the mark. To support his assertion that IPC "unquestionably knew" of NCED's wrongdoing--the scienter element of the FCA claim--Ahumada states that he

19

"was told that [IPC's] General Manager . . . refused to go along with the illegal scheme." Id. (emphasis added). But he does not state who told him this information--whether some third party or an employee of IPC itself. See United States v. N.Y. Med. Coll., 252 F.3d 118, 121 (2d Cir. 2001) (per curiam) (noting that a relator is not an original source if "a third party is the source of the core information on which the qui tam complaint is based" (internal quotation marks and emphasis omitted)). He thus has not established that his knowledge was "direct," rather than derived from an "intervening agency." See Grayson, 221 F.3d at 583.

Ahumada also alleges that IPC submitted to NCED eleven invoices for "226,701 complete GSA boxes" in September and October of 2004, after Ahumada informed an IPC representative of NCED's fraudulent conduct. J.A. 258. These boxes, Ahumada alleges, "were stamped with NCED's [box manufacturing certificate], falsely making it appear that the boxe[s] were manufactured by NCED in compliance with the JWOD . . . labor requirements." Id. But Ahumada offers no basis on which he could have known such detailed information directly. In fact, because the invoices Ahumada cites were issued after he left NCED in July 2004, this information almost certainly derives from public disclosures or some other intervening agency. Cf. Rockwell Int'l, 549 U.S. at 475 (concluding that the relator did

20

not possess direct and independent knowledge "[b]ecause [he] was no longer employed by [the defendant]" at the time the alleged fraud occurred).  Likely confirming as much, the same page of the second amended complaint explicitly cites testimony from the Lopez trial.

In sum, because Ahumada has not established that his allegations against IPC are based on his direct and independent knowledge, he does not qualify as an original source.

### d. Smurfit

Ahumada's allegations against Smurfit are much like those against Green Bay: Ahumada alleges that Smurfit began filling "large orders for complete or nearly complete containers" only "[a]fter [Ahumada] was terminated by NCED."  J.A. 260 (emphasis added).  Paragraph 145 of the second amended complaint does further allege that, after Ahumada was terminated, he informed Smurfit representatives of NCED's illegal conduct.  But it again provides no explanation for how Ahumada directly knew that Smurfit "continued to make complete containers" for NCED.  See id.  Moreover, the next paragraph of the complaint again cites testimony from the Lopez trial, strongly suggesting that this public disclosure was in fact the source of Ahumada's knowledge.  Ahumada is therefore not an original source with respect to the Smurfit allegations either.

### e. Weyerhaeuser

21

Ahumada's primary allegation against Weyerhaeuser is that, during the time that Ahumada worked at NCED, it "provided NCED with raw sheets as well as complete or nearly complete boxes." Id. at 261. According to the second amended complaint, Ahumada met with Steve Cartmill, a Weyerhaeuser sales manager, "on many occasions during this period" and took him on tours of the NCED facility. Id. On these tours, Cartmill allegedly saw that NCED failed to employ a sufficient number of disabled workers. The complaint further alleges that Cartmill told Ahumada that Weyerhaeuser was issuing artificially inflated invoices to NCED and later providing rebates, and that NCED had requested Weyerhaeuser to bill for raw sheets rather than complete boxes it actually provided. Based on these allegations, Ahumada asserts that Weyerhaeuser "facilitate[d] NCED's defrauding of the Government." Id. at 262.

Thus, in contrast to many of the allegations against the other defendants, Ahumada learned the facts underlying the Weyerhaeuser allegations directly through the course of his employment with NCED. See United States ex rel. Barajas v. Northrop Corp., 5 F.3d 407, 411 (9th Cir. 1993) (finding that the relator's knowledge "was direct and independent because he acquired it during the course of his employment"). To be sure, the information Ahumada alleges he learned from Cartmill might in some sense be characterized as secondhand. But Cartmill was

an employee of Weyerhaeuser itself, not an "<u>intervening</u> agency" or "third party." <u>See</u> <u>Grayson</u>, 221 F.3d at 583 (emphasis added); <u>see also</u> <u>N.Y. Med. Coll.</u>, 252 F.3d at 121. And, as further support for his original-source status, Ahumada alleges that he independently confirmed what Cartmill told him about Weyerhaeuser's billing practices through his own inquiry with NCED's Controller.

Because Ahumada's knowledge derived from an admission the defendant made to him during the course of Ahumada's employment--an admission Ahumada then confirmed "through his own efforts"--we believe it is sufficiently direct to satisfy the original-source exception.[5] <u>See</u> <u>Grayson</u>, 221 F.3d at 583; <u>see also</u> <u>United States ex rel. Devlin v. California</u>, 84 F.3d 358, 360 (9th Cir. 1996) (explaining that a relator's knowledge is direct and independent if he "discovered the information underlying his allegations . . . through his own labor"). Accordingly, the district court did not lack subject-matter jurisdiction over Ahumada's claims against Weyerhaeuser.

---

[5] Although the second amended complaint again refers to testimony from the Lopez trial, it notes only that the testimony "corroborated" Ahumada's allegations against Weyerhaeuser. J.A. 261. In other words, the allegations neither derive from the testimony nor directly rely on it. In any event, Ahumada accused Weyerhaeuser of wrongdoing before the Lopez trial began. And no other public disclosure in the record even mentions Weyerhaeuser.

C.

To summarize, we hold that the public-disclosure bar deprives the district court of jurisdiction over Ahumada's claims against NISH, Green Bay, IPC, and Smurfit. With respect to those defendants, the district court correctly determined that Ahumada's proposed amendments to his first amended complaint were futile. Because the public-disclosure bar does not preclude jurisdiction over the claims against Weyerhaeuser, however, we must also consider the separate question of whether those claims were adequately pleaded.

IV.

A.

As relevant here,[6] Ahumada asserts claims against Weyerhaeuser pursuant to three separate provisions of the FCA-- specifically, those imposing liability against a person who:

> (1) knowingly presents, or causes to be presented, [to the government] a false or fraudulent claim for payment or approval;

---

[6] Ahumada also asserted a claim against Weyerhaeuser for so-called "reverse" false claims. See 31 U.S.C. § 3729(a)(7) (2006). But by failing to discuss that claim in his brief, Ahumada has effectively abandoned it on appeal. See United States v. Al-Hamdi, 356 F.3d 564, 571 n.8 (4th Cir. 2004) ("[C]ontentions not raised in the argument section of the opening brief are abandoned."). As Ahumada's brief also neglects to mention the one-hundred John Doe defendants, his claims against them are likewise abandoned.

24

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [and]

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

31 U.S.C. § 3729(a) (2006).[7] Under the first two of these provisions, we have held that a relator must "plausibly allege four distinct elements: (1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material;" and (4) that "involved a claim" made to the government for payment."[8]

---

[7] Amendments to the FCA enacted in 2009 slightly alter the text of each of these provisions, and the second amended complaint cites the amended versions. Like the 2010 amendments, however, the 2009 amendments are generally not retroactive. See Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4(f), 123 Stat. 1617, 1625 ("The amendments made by this section shall take effect on the date of enactment . . . and shall apply to conduct on or after the date of enactment . . . .").

That said, the changes to § 3729(a)(2), specifically, apply to "all claims under the False Claims Act . . . pending on or after [June 7, 2008]." See id. § 4(f)(1). And a circuit split has arisen over whether "claims . . . pending," in this context, refers to underlying claims for payment from the government or the legal claims presented in the action itself. See, e.g., Sanders v. Allison Engine Co., 703 F.3d 930, 940 (6th Cir. 2012), cert. denied, 133 S. Ct. 2855 (collecting cases on both sides of the split). We need not address that issue here, however, because the changes to the text do not affect our analysis of the adequacy of Ahumada's allegations.

[8] We have previously framed the fourth element as requiring proof that that the false statement "caused the government to (Continued)

25

Rostholder, 745 F.3d at 700 & n.6 (internal quotation marks and alterations omitted).  To plead a claim for an FCA conspiracy, the relator must allege that the conspirators "agreed that [a] false record or statement would have a material effect on the Government's decision to pay [a] false or fraudulent claim." Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662, 673 (2008).

In alleging these elements, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). But allegations of fraud must also meet the more stringent "particularity" requirement of Federal Rule of Civil Procedure 9(b).  To satisfy Rule 9(b), "an FCA plaintiff must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."  United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d

pay out money."  See, e.g., Rostholder, 745 F.3d at 700 & n.6 (emphasis added).  While this formulation remains accurate with respect to § 3729(a)(1), the Supreme Court clarified in Allison Engine Co. v. United States ex rel. Sanders that § 3729(a)(2) merely requires proof that the defendant "made a false . . . statement for the purpose of getting a false or fraudulent claim paid or approved by the Government."  553 U.S. 662, 671 (2008) (internal quotation marks omitted).

370, 379 (4th Cir. 2008) (internal quotation marks omitted). More precisely, the complaint must allege "the who, what, when, where and how of the alleged fraud." Id. (internal quotation marks omitted). Requiring such particularized pleading, we have explained, "prevent[s] frivolous suits, . . . eliminat[es] fraud actions in which all the facts are learned after discovery, and . . . protect[s] defendants from harm to their goodwill and reputation." United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc., 707 F.3d 451, 456 (4th Cir. 2013), cert. denied, 134 S. Ct. 1759 (2014) (internal quotation marks omitted).

B.

Applying those standards here, we conclude that Ahumada has failed to plead viable FCA claims against Weyerhaeuser.

Ahumada essentially alleges that Weyerhaeuser participated in two separate schemes to defraud the government.[9] First, he alleges that Weyerhaeuser "provided NCED with . . . complete or

---

[9] The second amended complaint also contains certain undifferentiated allegations against "the [supplier] defendants" as a group. But because Rule 9(b) requires a relator to plead FCA claims with particularity--including by identifying "the 'who['] . . . of the alleged fraud"--we consider only the Weyerhaeuser-specific allegations here. See Wilson, 525 F.3d at 379; see also, e.g., Arnlund v. Smith, 210 F. Supp. 2d 755, 760 (E.D. Va. 2002) ("A plaintiff must identify, with particularity, each individual defendant's culpable conduct; defendants cannot be grouped together without specification of which defendant committed which wrong." (alterations and internal quotation marks omitted)).

27

nearly complete boxes," notwithstanding the fact that NCED had JWOD contracts to produce such boxes itself. J.A. 261-62. Second, he alleges that Weyerhaeuser provided inflated invoices to NCED and later issued rebates to NCED or its then-CEO, Jones, "for the amount in excess [of] the actual price." Id. at 262. Neither of these allegations passes muster.

With respect to the production allegation, we fail to see how Weyerhaeuser selling complete boxes to NCED, without more, constitutes a "fraudulent course of conduct." See Rostholder, 745 F.3d at 700. There is nothing inherently fraudulent about producing a particular product and selling it to a customer. And while it is true that applicable JWOD regulations prohibited NCED from "subcontract[ing] the entire production process for . . . an order without the Committee's prior approval," see 41 C.F.R. § 51-4.4(d), we have held that the FCA cannot "be used as a regulatory-compliance mechanism in the absence of . . . fraudulent conduct directed at the federal government," Rostholder, 745 F.3d at 702-03.

Ahumada's second amended complaint contains no specific allegation that NCED ever falsely represented to the government that it produced the boxes Weyerhaeuser provided. Although Ahumada does allege that an NCED representative "asked" a Weyerhaeuser customer service manager "to bill NCED for raw sheets instead of the completed boxes," Ahumada does not further

28

allege that Weyerhaeuser actually complied with that request. See J.A. 261-62. Nor does Ahumada allege that Weyerhaeuser, specifically, falsely stamped products it produced with NCED's box manufacturing certificate. Thus, in the absence of any other well-pleaded fraudulent course of conduct or false statement, the production allegation does not state a viable claim for a violation of the FCA.

Ahumada's allegation regarding the rebate scheme fares no better. This allegation (which comprises just a single sentence in the second amended complaint) is utterly devoid of specifics. Among other deficiencies, it offers no information regarding who at Weyerhaeuser was involved in the scheme, what Weyerhaeuser gained from participating, or when the scheme took place. Nor does the complaint offer even a general description of the rebates themselves--for example, an estimation of how many rebates Weyerhaeuser issued or in what amounts. Without any such specifics, the rebate allegation does not satisfy Rule 9(b).

Finally, we reject Ahumada's argument that he adequately pleaded a claim for conspiracy to defraud the government. See 31 U.S.C. § 3729(a)(3) (2006). To state a claim for conspiracy under the FCA, a relator must do more than simply show that the alleged conspirators agreed to make a false record or statement; the relator must also show "that the conspirators had the

purpose of 'getting' the false record or statement to bring about the Government's payment of a false or fraudulent claim." Allison Engine, 553 U.S. at 672-73.

Neither the production allegation nor the rebate allegation establishes a claim for an FCA conspiracy. In neither case does Ahumada adequately allege that Weyerhaeuser acted with the purpose of defrauding the government.[10] And, to the extent that these allegations plead agreements at all, Ahumada does not identify who at Weyerhaeuser entered them, when he or she did so, or what Weyerhaeuser sought to gain. The conspiracy claim therefore fails to meet even the basic plausibility standard of Rule 8(a), much less the more stringent particularity requirement of Rule 9(b). Cf. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007) ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").

In sum, we hold that Ahumada's second amended complaint fails to adequately plead any FCA claim against Weyerhaeuser.

---

[10] As a coda to his allegations against Weyerhaeuser, Ahumada asserts that "Weyerhaeuser participated in the above schemes to facilitate NCED's defrauding of the Government." J.A. 262. But he pleads no particular factual allegations to support this conclusion. This statement, accordingly, does not satisfy the "purpose" requirement articulated in Allison Engine. See Iqbal, 556 U.S. at 678 (stating that a complaint must offer more than "naked assertion[s] devoid of further factual enhancement" (internal quotation marks omitted)).

30

In conjunction with our previous determination that the district court lacked subject-matter jurisdiction over the claims against the other appellees, we agree with the district court that Ahumada's attempt to amend his pleading was futile. The district court therefore did not err in denying Ahumada leave to amend and dismissing his action.

V.

For the reasons given, we affirm the district court's judgment.

AFFIRMED