# United States Court of Appeals
## For the First Circuit

No. 04-1168

LOUIS J. GIULIANO; GTWO, LLC,
A Massachusetts Limited Liability Company,

Plaintiffs, Appellants,

v.

STANLEY FULTON; MY WAY HOLDINGS, LLC;
ANCHOR PARTNERS, LLC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, U.S. District Judge]

Before

Torruella, Circuit Judge,
Campbell, Senior Circuit Judge,
and Howard, Circuit Judge.

Robert S. Ovoian for appellants.
Thomas A. Reed, with whom J. Owen Todd, David H. Rich, and
Todd & Weld LLP were on brief, for appellees.

March 7, 2005

**HOWARD**, **Circuit Judge**.  Louis Giuliano and GTWO, LLC ("GTWO/MA") brought this civil action alleging that defendants Stanley Fulton, Anchor Partners, LLC ("Anchor"),[1] and My Way Holdings, LLC ("My Way") conspired to participate and participated, through repeated acts of mail and wire fraud, in an illegal racketeering scheme in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(b)-(d).  The district court dismissed the amended complaint for failure to state a claim.  See Fed. R. Civ. P. 12(b)(6).  We affirm.

## I.

We take as true the facts alleged in the complaint when reviewing a dismissal for failure to state a claim.  Soto-Negrón v. Taber Partners I, 339 F.3d 35, 36 (1st Cir. 2003).  At the heart of this lawsuit is a joint venture gone sour.  We note that the parties who were principally involved in the venture, and in the subsequent conduct that has been alleged to constitute a RICO violation, are not defendants in this action.  Indeed, the defendants here are accused of financing and furthering the racketeering scheme only after it had already been initiated by these other parties, who have been sued by the plaintiffs in state

---

[1]Although the amended complaint refers mostly to an entity named Anchor Gaming, Inc., it appears that Anchor Gaming was a subsidiary controlled by Anchor Partners, LLC.  Because the distinction is not critical to our disposition, we refer to both entities as "Anchor."

court, and whom we shall, at times, refer to as the "alleged conspirators."

The dispute centers around a 92-acre property in Massachusetts that Giuliano and an associate, Gary Piontkowski, discussed purchasing in 1997 for the purpose of operating a harness racing track. Piontkowski entered into a purchase and sale agreement with the owner of the property and, in 1998, formed Plainville Racing Company, LLC ("PRC") to operate the proposed racetrack. Shortly thereafter, Piontkowski assigned his rights in the property to Giuliano with the understanding that Giuliano, through his company GTWO/MA, would secure financing to complete the purchase of the property and to build the necessary facilities. Before acquisition of the property was complete, Giuliano executed a sublease whereby PRC leased, for the purpose of operating the racetrack, a 52-acre portion of the property from GTWO/MA for below-market rent. An addendum to the sublease granted PRC the right to exercise an option to purchase the subleased premises for fair market value.

Following execution of the sublease, the Massachusetts Racing Commission ("Commission") granted PRC a 1999 harness racing license (racing licenses are awarded annually by the Commission) conditioned on Giuliano completing acquisition of the property by December 1, 1998. Giuliano obtained the necessary financing and a deed to the property was executed in favor of GTWO/MA on November

16, 1998. Shortly after closing, however, and less than two weeks before expiration of the purchase and sale agreement, Giuliano's lender threatened to back out if the loan was not restructured under new terms. Given that both the Commission's deadline and the expiration of the purchase and sale agreement were fast approaching, Giuliano agreed to the new terms.

Under the restructured loan, a nominee of the lender, a limited liability company formed by the lender under Rhode Island law, GTWO, LLC ("GTWO/RI"), took title to the property. Giuliano received an option to purchase the property and a master lease giving him control of the property during the pendency of the option. Giuliano could exercise the option, at any time before January 28, 2000, by paying back his loan advancement in full plus interest. The lender required GTWO/MA and PRC to execute a First Amendment to Lease ("First Amendment") to confirm that the sublease between GTWO/MA and PRC was subordinate to the master lease between GTWO/RI and GTWO/MA. The First Amendment also converted PRC's option to purchase the subleased premises into an option to purchase GTWO/MA's one-year leasehold interest. Giuliano and Piontkowski signed the First Amendment with Russell Paige, an employee of GTWO/MA, serving as an attesting witness.

Shortly after the restructuring, and in response to the negative cash flow created by PRC's below-market rent,[2] Giuliano insisted that Piontkowski provide him with an option to purchase all of Piontkowski's shares of PRC stock for $1 million. Piontkowski agreed and a stock purchase agreement was executed in favor of Giuliano. When Giuliano subsequently learned that another Piontkowski-owned company was also a part-owner of PRC, Giuliano had Piontkowski execute a second stock purchase agreement that gave Giuliano the option to purchase all of the shares of that company. Piontkowski then asked Giuliano to sign a Lease Confirmation and Acknowledgment agreement ("Lease Confirmation") that essentially stated, in contravention of the First Amendment, that PRC's option to purchase the subleased premises was binding upon GTWO/RI. Giuliano refused to sign the Lease Confirmation, believing that he did not have authority to sign for GTWO/RI.

Beginning in June of 1999, PRC began breaching its obligations under the terms of the sublease and GTWO/MA provided PRC with several written notices of default. According to Giuliano, this is when Piontkowski hatched a scheme to seize Giuliano's property. On June 25, 1999, Piontkowski sent a letter to Giuliano asserting PRC's purported right to purchase the subleased premises. Attached to the letter was a copy of the Lease

_____

[2]While Giuliano's rent accrued at a rate of $180,000 per month under the master lease, he only collected $81,000 per month from PRC under the sublease.

Confirmation (that Giuliano had previously refused to sign, but which seemingly bore his signature), that PRC asserted created privity between PRC and the record title owner of the property. Giuliano denied the authenticity of the document, alleging that it was a "switched-page" forgery -- the attached signature page actually coming from the First Amendment that Giuliano had previously signed for his lender.

In two separate letters in the fall of 1999, Giuliano notified Piontkowski first, of his intent to exercise his options under the stock purchase agreements to acquire all of Piontkowski's interests in PRC and in the other Piontkowski-owned entity, and second, of the termination of PRC's sublease due to PRC's defaults. Piontkowski, however, refused to sell his ownership interest in PRC and refused to surrender the subleased premises.

In late September 1999, Piontkowski called a meeting of PRC's investors to discuss PRC's application, to be filed in competition with Giuliano, for a year 2000 racing license. After the investors concluded that the switched-page Lease Confirmation was not authentic, Paige, now employed by PRC, manufactured a new version of the Lease Confirmation by cutting and pasting Giuliano's signature onto a blank Lease Confirmation form. Paige forwarded this "cut-and-paste" forgery to Piontkowski, who later circulated it to the PRC investors.

In October 1999, PRC submitted a year 2000 application stating that PRC had long-term control of the subleased premises. At a series of Commission hearings in October and November 1999, Piontkowski and PRC presented the switched-page forgery as evidence of PRC's rights to the property. Piontkowski and Paige testified that Piontkowski had never signed the First Amendment and had never agreed to subordinate PRC's sublease to Giuliano's master lease. Moreover, they testified that Giuliano had signed the Lease Confirmation, which acknowledged that PRC had a 30-year lease with an option to purchase the premises. Piontkowski asserted that it was Giuliano who had perpetrated the fraud by attaching the signature page from the Lease Confirmation onto the First Amendment. When the authenticity of the switched-page Lease Confirmation was questioned, Piontkowski submitted the cut-and-paste Lease Confirmation. Relying on the forged documents and perjured testimony, the Commission concluded that PRC's sublease had not been subordinated to the master lease and thus PRC had a long-term right to control of the premises. Accordingly, on November 15, 1999, the Commission granted a year 2000 racing license to PRC.

Piontkowski and PRC then filed a complaint in Massachusetts state court seeking a declaration that PRC had validly exercised its option to purchase the subleased premises. On November 1, 1999, PRC used the cut-and-paste forgery and

perjured testimony to obtain a Memorandum of <u>Lis</u> <u>Pendens</u> from the court that effectively clouded title to the property. Throughout the course of these state proceedings, PRC submitted numerous fraudulent filings to the court. The state court relied on these fraudulent misrepresentations in denying Giuliano's motion to dismiss.

On November 12, 1999, Giuliano filed his own Massachusetts state court action against Piontkowski and PRC seeking specific performance of the stock purchase agreements. In their answer, Piontkowski and PRC again relied on the cut-and-paste forgery. Because the ultimate objective of the racketeering scheme was to unite the alleged conspirators' control of both the racing license and the racetrack property, and since PRC was the entity they were using to achieve that end, the alleged conspirators' misrepresentations in this state action were intended to further the scheme by preventing Giuliano from seizing control of PRC.

In December 1999, anticipating the expiration of Giuliano's option, Alfred Ross, one of PRC's investors, solicited financing from Stanley Fulton and Anchor. Fulton and senior management from Anchor met with Ross and Piontkowski in Arizona later that month to discuss financing the acquisition of the property. Fulton was apprised of the fraudulent basis of PRC's and Piontkowski's claims against Giuliano and was made aware of the means and objectives of the illegal scheme. Despite this

knowledge, Fulton and Anchor agreed to provide $5 million toward acquisition of the property. Mindful of Giuliano's outstanding claims under the stock purchase agreements, the alleged conspirators formed a straw holding company to shield the property from the potential reach of Giuliano. All of PRC's investors, including Ross and Piontkowski, combined with Fulton and Anchor to create Ourway Realty, LLC ("Ourway").

The scheme was successful. With the lis pendens clouding record title, Giuliano was unable to obtain the financing necessary to exercise his option before it expired on January 28, 2000. Shortly thereafter, PRC released, without consideration, its claim against GTWO/RI that it had a 30-year lease with an option to purchase, thus lifting the cloud on title. The alleged conspirators then acquired the property, Ourway took title, and PRC entered into a series of one-year leases with Ourway. PRC did not, however, pay any rent to Ourway, and the leases explicitly provided for the automatic termination of PRC's leasehold interest should Giuliano gain control of PRC.[3]

According to Giuliano, the alleged conspirators have persisted in their misrepresentations to the state courts and to the Commission. In the three years following Ourway's acquisition of the property, PRC and Piontkowski continued to deny falsely, in

_____

[3]In June of 2000, Giuliano was granted summary judgment by the Massachusetts court as to his right to enforce the stock purchase agreements.

state court and Commission filings, any knowledge concerning the origin of the cut-and-paste forgery. These misrepresentations were allegedly made with the full knowledge and acquiescence of the defendants.

On October 1, 2003, Ourway filed an application for a year 2004 racing license. The application stated Ourway's intention to purchase all of PRC's assets in exchange for a cancellation of debt owed by PRC to Ourway for accrued unpaid rent. Ourway's application stated that Piontkowski would continue as the manager of the racetrack. The proposed transfer of PRC's assets to Ourway is the most recent ploy to defeat Giuliano's efforts to reacquire control of the property.

On October 10, 2003, Giuliano and GTWO/MA (henceforth "Giuliano") moved to file an amended complaint in Massachusetts federal district court alleging that the defendants were conspirators and active participants in a pattern of racketeering activity whereby mail and wire communications were used to defraud the plaintiffs of valuable property in violation of 18 U.S.C. §§ 1962(b)-(d). The district court allowed the amended complaint, but nevertheless dismissed the case for failure to state a claim. The court held that the plaintiffs failed to allege a pattern of racketeering activity sufficient to make out a RICO claim because the alleged predicate acts did not "amount to or pose a threat of continued criminal activity."

In this appeal, Giuliano argues that the district court minimized or ignored three important factors: (1) that the alleged illegal scheme was carried out over a period of more than four years; (2) that the alleged scheme was both extensive and complex; and (3) that the alleged scheme posed a "societal threat" because it perpetrated a fraud on the Massachusetts state courts and on the Commission. According to Giuliano, having overlooked these factors, the court failed to comprehend the true breadth and depth of the alleged racketeering activity.

## II.

We review de novo a district court's dismissal of a complaint for failure to state a claim. Soto-Negrón, 339 F.3d at 38. When reviewing a Fed. R. Civ. P. 12(b)(6) dismissal, "[w]e accept as true the well-pleaded factual allegations of the complaint, draw all reasonable inferences therefrom in the plaintiff's favor and determine whether the complaint, so read, sets forth facts sufficient to justify recovery on any cognizable theory." Martin v. Applied Cellular Tech., Inc., 284 F.3d 1, 6 (1st Cir. 2002).

To state a RICO claim, plaintiffs must allege four elements: "(1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity." Kenda Corp. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 233 (1st Cir. 2003) (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)).

-11-

"Racketeering activity" means any act that violates one of the federal laws specified in the RICO statute, see 18 U.S.C. § 1961(1), including the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343.  At least two acts of racketeering activity must occur within ten years of each other to constitute a "pattern." Id. § 1961(5).  The Supreme Court has construed the pattern element as additionally requiring a showing that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity."  H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989).  This is the so-called "continuity plus relationship" standard.  Efron v. Embassy Suites (P.R.), Inc., 223 F.3d 12, 15 (1st Cir. 2000).

The Supreme Court has identified two methods for establishing continuity.  Under the "closed-ended" approach, continuity is established by showing "a series of related predicates extending over a substantial period of time" that "amount to" a threat of continued criminal activity.  H.J., 492 U.S. at 242.  Because the RICO statute was only intended to reach long-term criminal conduct, "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the continuity] requirement."  Id.  Under the "open-ended" approach, a RICO plaintiff need not wait for a long-term pattern to develop, but may state a claim so long as the alleged "racketeering acts themselves include a specific threat of repetition extending

-12-

indefinitely into the future [or] . . . are part of an ongoing entity's regular way of doing business." Id.

In this case, the district court declined to find either "open-ended" or "closed-ended" continuity. The court concluded that the plaintiffs failed to establish open-ended continuity because the only scheme alleged in the amended complaint, "to take over certain valuable real estate . . . in Massachusetts," presented no danger of continuing racketeering activity "indefinitely into the future." Relying on Efron, 223 F.3d at 18, the court also concluded that the plaintiffs had not shown closed-ended continuity because the alleged racketeering activity concerned a single scheme with a closed group of targeted victims. Because the parties focus their arguments on the correctness of the court's closed-ended continuity holding, we begin our analysis there.

Giuliano's primary appellate argument is that the amended complaint alleged numerous predicate acts extending over four years and that these allegations of temporal duration and extensive conduct satisfy the requirement for closed-ended continuity. He points out that a closed-ended pattern sometimes can be established by examining only the number of alleged predicate acts and the duration of the alleged racketeering activity. See H.J., 492 U.S. at 242. This is because, where the temporal duration of the alleged activity and the alleged number of predicate acts are so

extensive that "common sense compels a conclusion of continuity," closed-ended continuity should be found. Efron, 223 F.3d at 18; see also Fleet Credit Corp. v. Sion, 893 F.2d 441, 446-47 (1st Cir. 1990) (holding that an allegation of 95 fraudulent mailings over a period of four and one-half years is sufficient, without more, to state a pattern of racketeering activity).

Conversely, where only a few predicate acts are alleged, or where the period of time is short, continuity can never be established. See Sion, 893 F.2d at 447. This is because "[t]oo few acts would suggest that the defendants were engaged in only 'sporadic activity,' . . . and too short a period of time would suggest that defendants were not engaged in 'long-term criminal conduct.'" Id. (quoting H.J., 492 U.S. at 239, 242).

Some cases, however, fall into a middle ground where the duration and extensiveness of the alleged conduct does not easily resolve the issue. In these cases, we examine other indicia of continuity, see Efron, 223 F.3d at 17 (where plaintiff alleged 17 acts of wire and mail fraud over 21 months, the time frame was "not so long[,]" nor were the predicate acts "so many[,]" that "other indicators of continuity--or the lack of them--are without significance"), including whether the RICO allegation concerns only a single scheme that is not far reaching, see Kenda Corp., 329 F.3d at 233; Apparel Art Int'l, Inc. v. Jacobson, 967 F.2d 720, 723-24 (1st Cir. 1992) (Breyer, C.J.). In such cases, we decline to find

-14-

the requisite continuity. See Sys. Mgmt., Inc. v. Loiselle, 303 F.3d 100, 105-06 (1st Cir. 2002) ("RICO is not aimed at a single narrow criminal episode, even if that single episode involves behavior that amounts to several crimes.").

In light of these principles, our first task is to determine whether the duration of the alleged racketeering conduct is either so long or so short that the continuity determination can be resolved on that basis alone. In performing this task, we evaluate the complaint through the particularity prism of Fed. R. Civ. P. 9(b), see New England Data Servs., Inc. v. Becher, 829 F.2d 286, 290 (1st Cir. 1987), considering "only those predicate acts specifically alleged" in the complaint, Efron, 223 F.3d at 16. Also, we do not credit generic allegations of common law fraud that do not implicate the mails or wires, as these acts do not constitute racketeering activity under RICO. See Sion, 893 F.2d at 445; see also Efron, 223 F.3d at 20 (noting that "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it").

With this in mind, we give the amended complaint the required scrutiny.[4] Many of the specific allegations of fraud do

_____

[4]The defendants also contend that the plaintiffs failed to allege a conspiracy adequately, and thus we should not consider any acts committed by the non-defendant conspirators. They also say

-15-

not implicate the mail or the wires. For example, it is claimed that Piontkowski submitted the switched-page forgery and testified falsely concerning that document at an October 21, 1999 Commission hearing. While this allegation, if true, may constitute fraud or other common law or statutory violations, it does not amount to a RICO predicate act because Piontkowski is not alleged to have utilized the mail or the wires. We will not imply or read into the amended complaint the mail or wire connection where it is not alleged specifically. See Sion, 893 F.2d at 444 (we have "no duty to conjure up unpled allegations in order to bolster the plaintiff's chances of surviving a 12(b)(6) motion to dismiss") (internal quotation marks omitted).

With respect to the actual named defendants, the most we are told is that "[t]he arrangements for the Arizona meeting [with Piontkowski and Ross], the agreements calling for Fulton [and Anchor] to provide financing in furtherance of the Illegal Scheme, [and] the actual transfer of the funds Fulton provided for the financing were all accomplished through the use of the mail and interstate wire communications." We are also told that "[o]n multiple occasions on and after December of 1999, Fulton consulted

that misrepresentations made to the state courts and to the Commission, as well as the attempts to conceal underlying racketeering activity through fraudulent misrepresentations, are not predicate acts under RICO. Because the amended complaint fails to state a viable RICO claim even if these allegations are taken into account, we bypass these arguments.

and communicated by mail, telephone and interstate wire transmission with the other participants in the Illegal Scheme, to discuss the planning and to make decisions about the method and strategy of carrying out the Illegal Scheme." These vague allegations do not satisfy Fed. R. Civ. P. 9(b). See North Bridge Assocs., Inc. v. Boldt, 274 F.3d 38, 43 (1st Cir. 2001) (RICO plaintiff must state "the time, place and content of the alleged mail and wire communications perpetrating" the fraud) (internal quotation marks omitted); Sion, 893 F.2d at 444-45.

The attempt to establish the ongoing nature of the racketeering activity also falls short. Giuliano alleges that the alleged conspirators maintained their misrepresentations, with the full knowledge and acquiescence of the defendants, throughout the pendency of the two state court proceedings and each year, from 1999 to 2003, when the Commission considered racing license applications. But even assuming these misrepresentations could be actionable under RICO, all of Giuliano's post-1999 allegations fall well short of satisfying Fed. R. Civ. P. 9(b). For example, the amended complaint alleged that "[c]ontinuously since the start of the state court litigation between the parties in 1999, and after Fulton, Anchor Partners and My Way joined the Illegal Scheme shortly thereafter, Piontkowski [and] PRC have made innumerable fraudulent misrepresentations to the state court and to the

-17-

Commission." No specificity is provided with regard to the time, place or content of these alleged misrepresentations.

Giuliano additionally alleges that Ourway's October 1, 2003 filing with the Commission, stating its intention to purchase all of PRC's assets, establishes a proposed fraudulent transfer of assets designed to frustrate Giuliano's efforts to regain control of the racetrack.[5] However, a proposed or anticipated fraudulent act cannot be counted as a predicate act in furtherance of a closed-ended racketeering scheme. Cf. Lincoln House, Inc. v. Dupre, 903 F.2d 845, 847 (1st Cir. 1990) (affirming the dismissal of a RICO claim as unripe where the plaintiff's alleged injury was "contingent on events that may not occur as anticipated or may not occur at all").

Having pruned the amended complaint to its properly pleaded allegations, we are left with an alleged scheme that is far less extensive than portrayed by the plaintiffs. On June 25, 1999 Piontkowski and PRC allegedly sent correspondence to Giuliano via mail and fax asserting the right under the forged Lease Confirmation to purchase the subleased premises. Similar correspondence was sent to Giuliano by mail on October 1 and again on October 5, 1999. Around this time, Paige allegedly faxed the cut-and-paste forgery to Piontkowski, who then faxed it to the

---

[5]Giuliano's appellate brief asserts that the allegedly fraudulent transfer was indeed consummated after the amended complaint was filed.

other PRC investors. Paige also allegedly e-mailed PRC's attorney a draft of the false statement that he planned to deliver to the Commission at the November 1999 hearings. Regarding the allegedly fraudulent PRC filings, the amended complaint provided details on three: (1) a post-hearing submission sent by mail to the Commission and Giuliano on November 9, 1999; (2) PRC's request to the state court for a <u>lis</u> <u>pendens</u> sent by mail in December 1999; and (3) PRC's opposition to Giuliano's motion to remove the <u>lis</u> <u>pendens</u> sent by mail in December 1999.

Finally, the amended complaint alleged that PRC and Piontkowski attempted to conceal the underlying fraud through (1) an affidavit by Piontkowski, denying any knowledge of the forgeries, that was faxed to the state court in a December 1999 opposition to Giuliano's motion to dismiss the <u>lis</u> <u>pendens</u> action, and (2) a written discovery response, sent by mail to Giuliano's counsel sometime in 2001, falsely omitting any reference to the draft statements created for Paige's November 1999 Commission testimony.

Thus, we are left with approximately 16 alleged predicate acts[6] conducted almost exclusively between June and December of

---

[6]Given the vagueness inherent throughout the amended complaint, even after culling it to its properly plead allegations, it is difficult to come to a precise figure. For example, it is alleged that Piontkowski faxed the cut-and-paste forgery to the PRC investors. The amended complaint does not quantify exactly how many PRC investors this document was sent to. Elsewhere the amended complaint mentions at least four people who were PRC

1999, the only exception being the allegedly misleading discovery response in 2001. Our case law suggests that the commission of 16 predicate acts over a six-month period is inadequate to establish a closed-ended pattern of racketeering activity. See Loiselle, 303 F.3d at 106 (21-month scheme involving mail fraud was not actionable under RICO); Boldt, 274 F.3d at 43 (two acts of mail fraud over four months insufficient to support a RICO claim).

But even assuming that this case falls into the middle ground, the plaintiffs have failed to allege a pattern of racketeering activity with the required closed-ended continuity. As discussed above, where a case falls into the middle ground, we have consistently declined to find continuity where the RICO claim concerns a single, narrow scheme targeting few victims. See Efron, 223 F.3d at 19 ("[C]ombination of single scheme, single injury, and few victims . . . makes it virtually impossible for plaintiffs to state a RICO claim.") (internal quotation marks omitted). At most, the plaintiffs' amended complaint establishes a situation similar to Efron, where we held that the plaintiff's allegation that his business partners engaged in a series of 17 predicate acts over a 21-month period failed to state a pattern of racketeering activity. We concluded that while the 21-month period fell into the middle ground, the claim failed because all of the alleged acts of

investors at around that time. For the sake of our analysis, therefore, we will assume that Piontkowski faxed the forgery four times on this occasion.

deception "were aimed at the single goal of transforming the ownership of the [business]" and harmed only three named victims. Efron, 223 F.3d at 18; see also Apparel Art, 967 F.2d at 723. So too here. The amended complaint alleges a six-month scheme[7] to fraudulently procure ownership of a single piece of property from one individual victim and his company.[8] Their only injury was the loss of the property and the accompanying racetrack. There is no allegation that anything broader or more far reaching was attempted. Thus, this case falls squarely within our precedent rejecting closed-ended continuity. See Efron, 223 F.3d at 21 ("Taken together, the acts as alleged comprise a single effort, over a finite period of time, to wrest control of a particular [business venture] from a limited number of [victims]. This cannot be a RICO violation.").

---

[7]The allegedly fraudulent 2001 discovery response does nothing to extend the scheme, as a "pattern is not formed by sporadic activity." H.J., 492 U.S. at 239.

[8]Contrary to the plaintiffs' assertion, we do not view the Massachusetts state courts or the Commission as "victims" of the alleged racketeering scheme. Moreover, merely alleging that the defendant used a governmental body as a tool for facilitating a racketeering scheme that ultimately harmed the plaintiff is not enough to transform a narrow scheme into a broad and far reaching scheme. See Apparel Art, 967 F.2d at 721-24 (finding no pattern of racketeering activity and placing no import on the plaintiff-subcontractor's allegation that the defendant-contractor's scheme to obtain a government contract included submission of false statements to the United States Department of Defense); see also Loiselle, 303 F.3d at 105-06 (finding the absence of a broad and far reaching racketeering scheme where the defendant had secured and maintained a contract with a state-run college system through several acts of mail fraud).

The district court's ruling that there was no open-ended continuity is similarly unassailable. The amended complaint did not allege a specific threat of repetition extending indefinitely into the future, nor did it allege that the racketeering acts were a part of the defendants' regular way of doing business. To the contrary, it acknowledged that all of the racketeering activity was focused on the singular objective of wresting control of the racetrack away from Giuliano. Once achieved, the illegal scheme, as alleged, would end. The amended complaint does not suggest that the defendants or the alleged conspirators would "seek to repeat their fraud in other . . . similar business settings," or that they would "employ mail and wire fraud indefinitely" in their future racing or gaming operations. Id. at 19.

## III.

For the foregoing reasons, the district court concluded correctly that the plaintiffs' amended complaint alleged neither a closed-ended nor an open-ended pattern of racketeering activity. Therefore, the amended complaint was properly dismissed.

**Affirmed**.