# United States Court of Appeals
## For the First Circuit

No. 12-2387

HOME ORTHOPEDICS CORP.,

Plaintiff, Appellant,

v.

RAÚL RODRÍGUEZ; JOSÉ A. LINARES; JULIO F. JULIÁ; PAUL PINO,

Defendants, Appellees,

UNIDENTIFIED DIRECTORS AB, BC, CD, DE, EF, FG, GH, HI, IJ, JK, KL
OF HUMANA HEALTH PLANS OF PUERTO RICO (D/B/A HUMANA); DIRECTORS
LM, MN, NO, OP, PQ, QR, RS, ST, TU, UV, VW, WX OF MEDICAL CARD
SYSTEM, INC. (MCS); A, B, C, D, E, F, G, H, I INSURANCE
COMPANIES; LUIS GORIS-GARCÍA; ARLENE MARRERO;
JAVIER MAGRIÑÁ-MELÉNDEZ,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Thompson, Baldock,[*] and Selya,
Circuit Judges.

Carlo Defendini-Díaz and Pagán, Ortega & Defendini Law
Offices, PSC, on brief for appellant.
Theresa M.B. Van Vliet, Patsy Zimmerman-Keenan, and Genovese
Joblove & Battista, P.A., on brief for appellees Raúl Rodríguez,
José A. Linares, and Paul Pino.

[*] Of the Tenth Circuit, sitting by designation.

          Roberto Santana Aparicio, Berenice B. Bellotti Sevilla, and
Del Toro & Santana, on brief for appellee Julio F. Juliá.

_____

March 25, 2015

_____

**THOMPSON, Circuit Judge**. Home Orthopedics Corp., a medical equipment supplier based in Puerto Rico, sued the defendants for their alleged involvement in a scheme to help one guy collect a consulting fee Home Orthopedics agreed to pay him, but based on a contract it later discovered was phony. Fueled by Home Orthopedics' refusal to continue paying the fee, the defendants purportedly wielded their influence over players in the health insurance industry to jeopardize numerous contracts Home Orthopedics had with other clients.

The Puerto Rico district court dismissed Home Orthopedics' numerous federal and Commonwealth law causes of action. Home Orthopedics now appeals the dismissal of its primary claim, brought under the Racketeer Influenced and Corrupt Organizations Act, or "RICO," disposed of for failure to state a claim. Home Orthopedics also appeals the district court's denial of its motions to conduct limited discovery and amend the complaint.

For the reasons discussed below, we affirm the district court.

### BACKGROUND

Because we are reviewing a motion to dismiss for failure to state a claim, we recite the facts as they are alleged in the operative complaint and RICO case statement, in the light most

-3-

favorable to Home Orthopedics.[1]  Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12-13 (1st Cir. 2011).

**The Letter of Agreement**

Since 2001, Home Orthopedics, a home medical equipment supplier and the leading company in Puerto Rico for orthotics, prosthetics, and diabetic shoes, supplied medical equipment to MMM HealthCare, Inc., a Puerto Rican health maintenance organization that we'll refer to as "the HMO."  But in mid-2004, Defendant Clinical Medical Services, Inc. ("Clinical Medical"), also a home medical equipment supplier in Puerto Rico, struck a deal with the HMO to be its exclusive provider of "durable medical equipment," a specific category of long-lasting medical equipment used by patients in the home, including, for instance, hospital beds, canes, and crutches.

In late 2004, Clinical Medical's president, Raúl Rodríguez ("Raúl"), met with Home Orthopedics' president, Jesús

---

[1] A RICO case statement is a standard questionnaire that district courts may order from plaintiffs in civil RICO cases to "adduce the specifics that underlie general claims of RICO misconduct."  O'Ferral v. Trebol Motors Corp., 45 F.3d 561, 562 (1st Cir. 1995).  Here, the district court ordered Home Orthopedics to file one "in an effort to aid the Court in assessing RICO claims at an early pleading stage."  The district court allowed Home Orthopedics' amended case statement to be considered part of the pleadings, and so we have considered it in our review.
Even with the case statement (which ended up being largely a regurgitation of the complaint), we had difficulty constructing a sensible narrative from Home Orthopedics' papers.  We did our best with what we were given.  See Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 79 (1st Cir. 2014) (warning that we will not "haphazardly mine" complaints or the documents attached to them).

Rodríguez ("Jesús"), claiming that in addition to the exclusivity agreement for durable medical equipment, Clinical Medical had entered into an additional agreement with the HMO to be its exclusive provider of orthotic and prosthetic services. Raúl told Jesús that Clinical Medical would need a subcontractor to actually provide those services, however, because Clinical Medical "did not know anything about orthotics and prosthetics."

The complaint doesn't say whether Jesús agreed in that meeting to subcontract for Clinical Medical, but in February 2005, Jesús received a faxed "Letter of Agreement" from Raúl. The letter, a copy of which was attached to the complaint, was an unsigned, draft agreement between Home Orthopedics and the HMO (even though Raúl sent Jesús the contract and arranged for Jesús to sign it, Clinical Medical was not actually a party to the contract). The agreement would allow Home Orthopedics to continue providing orthotic and prosthetic services to the HMO's subscribers, but at a 20 percent lower profit, reducing Home Orthopedics' sales reimbursement from 100 percent to 80 percent. Specifically, the agreement provided:

> [Home Orthopedics] indicates its intent to enter into an agreement with [the HMO] to render Orthotic and Prosthetic services to patients enrolled in [the HMO]. By signing this Agreement, [Home Orthopedics] agrees to render professional healthcare services and to accept [80 percent reimbursement] as full payment for all Covered Services to patients referred to [Home Orthopedics].

-5-

The agreement was drafted in English, of which Jesús functionally knew little. When Jesús asked Raúl for an explanation of the agreement, Raúl "threatened" that Home Orthopedics was "being put out of business," and told Jesús to "take it or leave it" because another prosthetics company was also interested in the deal.

Jesús opted to take it. He signed the agreement, even though (as we gather from facts pleaded later in the complaint) he had not spoken with anyone from the HMO about it, and no one from the HMO had signed it yet.

Jesús also agreed with Raúl that in exchange for choosing Home Orthopedics as the subcontractor, Clinical Medical would earn a 12.5 percent consultant's commission on Home Orthopedics' sales to the HMO, to be paid directly to Raúl. Under the deal with Clinical Medical, then, Home Orthopedics would start receiving only 67.5 percent of the sales it made to the HMO, as opposed to the 100 percent it had been making.

### Raúl Gets Caught

With the new deal in place, business went on as usual, and in August 2005, Home Orthopedics sent the HMO an invoice. The HMO, though, sent Home Orthopedics a check accounting for 100 percent of the bill. Home Orthopedics thought the HMO made a mistake, and, in "good faith," reminded the HMO that it should have paid out only 80 percent under the terms of the Letter of

Agreement. But the HMO responded that it had never seen that agreement and would "investigate[] the matter."

It's not clear from the complaint what happened in the meantime, but around October 2006, Jesús found out from the HMO that Clinical Medical was not actually its exclusive provider of orthotics and prosthetics; Clinical Medical and the HMO had negotiated an agreement to that extent, but Clinical Medical allowed the exclusivity option to expire. At that point, Home Orthopedics stopped paying Raúl his consulting fee.[2]

Raúl was displeased. He demanded Jesús pay him for the fees he earned in 2005 and 2006, and when Jesús wouldn't budge, defendants José Linares and Paul Pino, also executives at Clinical Medical, started calling and sending letters to Jesús to try to "collect the money owed to Raúl."[3] Raúl also "frequently called [Jesús] requesting payments and threatened him with the 'loss of his business.'"

### Continued Collection Efforts

By mid- to late-2008, Raúl warned Jesús that he would "see [him] bleed drop by drop until [he] remain[ed] without a business." Eventually Jesús, "under duress," relented and paid

------

[2] The complaint doesn't tell us why Home Orthopedics continued paying Raúl a commission for the year after finding out that the HMO had never seen the Letter of Agreement.

[3] It is not clear why Raúl would need to seek his fees from 2005 and 2006 if Home Orthopedics did not stop paying him until October 2006.

Raúl $150,000 -- on top of the $600,000 he had already paid -- via numerous payments made throughout 2008.[4]

Raúl wasn't satisfied, and, apparently undeterred by Jesús's refusal to pay more money, Clinical Medical filed a lawsuit against Home Orthopedics in Puerto Rico state court in April 2009. Raúl tried to get Jesús to settle the case, warning that his attorneys "have a great influence in the Puerto Rico courts." Jesús didn't bite, and in fall 2009, started receiving collection calls and emails from Pino. He also received a written settlement demand (and follow-up correspondence regarding the settlement demand) from Linares and Pino.

### Other Terminated Contracts

In the meantime, other companies in the health insurance field started terminating their contracts with Home Orthopedics, which Raúl had warned Jesús would happen if he didn't "cooperate." The first was in November 2006, shortly after Home Orthopedics stopped paying Raúl, when Medical Card System, Inc. terminated its contract with Home Orthopedics, supposedly for lack of proper credentialing (Home Orthopedics asserts that it had the proper credentials). After failed attempts to get Medical Card System to change its mind, Home Orthopedics hired someone to help negotiate a new services agreement with the managed care organization. During

---

[4] The complaint does not specify for how much Raúl was asking, but in a demand letter dated March 12, 2009, Raúl's lawyers claimed that "the amount owed . . . exceeds [$1 million]."

that negotiation meeting, defendant Julio F. Juliá, a friend of Raúl's who had recently begun working at Medical Card System, interrupted to falsely claim that Medical Card System could not negotiate directly with Home Orthopedics because Home Orthopedics had an exclusivity agreement with Clinical Medical.

In June 2007, First Medical, an insurance company, terminated its contract with Home Orthopedics without explanation; so did Humana Health Plans of Puerto Rico, a healthcare network, on August 1, 2009.

In September 2009, Home Orthopedics made a deal to be the "exclusive announced company of orthotics and prosthetics" at Medical Card System's convention. Medical Card System, however, cancelled the exclusivity deal and returned Home Orthopedics' payment for exclusivity, instead deciding to allow other companies to advertise along with Home Orthopedics.

Finally, in March 2010, Medical Card System terminated its new services agreement with Home Orthopedics, but this time, without giving any reason.

## This Lawsuit

Convinced that the defendants -- some of whom worked with Raúl, and others of whom worked for the companies that terminated their contracts with Home Orthopedics -- were all in cahoots to help Raúl strongarm more money, Home Orthopedics filed suit in June 2011 in the Puerto Rico federal district court. The amended complaint,

which is now the operative one in this case, sought relief against numerous defendants for violating numerous federal and Commonwealth laws, including RICO (18 U.S.C. §§ 1962(b), (c), and (d)).[5] Home Orthopedics' theory of the case was that the defendants' above-described conduct amounted to extortion, mail fraud, and wire fraud, all actionable under RICO.

Several defendants moved to dismiss the amended complaint for failure to state a claim.[6] A magistrate judge issued a report and recommendation to dismiss the complaint, which the district court largely adopted, dismissing all the federal claims with prejudice and the supplemental state law claims without prejudice. Specifically, the district court held that Home Orthopedics failed to adequately allege that Juliá was part of an enterprise. The court also concluded that the complaint did not sufficiently allege that Raúl, Linares, and Pino engaged in a "pattern of racketeering activity," as all of their actionable racketeering acts "relate[d]

---

[5] The complaint also brought causes of actions for violations of: The Sherman Act (15 U.S.C. § 3); The Hobbs Act (18 U.S.C. § 1951); The Travel Act (18 U.S.C. § 1952); mail fraud (18 U.S.C. § 1341); wire fraud (18 U.S.C. § 1343); failure to conform with Medicare credentialing (42 C.F.R. § 422.204); tortious interference with contract (P.R. Laws Ann. tit. 31, § 5141); extortion (P.R. Laws Ann. tit. 33, § 4828); and fraud (P.R. Laws Ann. tit. 33, § 4838).

[6] Originally, Home Orthopedics appealed the dismissals of the RICO claim against Raúl, Linares, Pino, and Juliá, as well as three other defendants, Javier Magriñá-Meléndez, Arlene Marrero, and Luis Goris-García. Home Orthopedics has since voluntarily dismissed the latter three defendants from the appeal.

to a single transaction" -- the signing of the 2005 Letter of Agreement -- "aimed to extort" Home Orthopedics. The court also denied Home Orthopedics' request to amend its complaint for a second time in lieu of dismissal.

This timely appeal followed. Home Orthopedics only asks us, however, to either revive its substantive RICO claim, brought under 18 U.S.C. § 1962(c)[7] (or allow it to amend its complaint to add more allegations to support it).

## DISCUSSION

### Motion to Dismiss

#### Standard of Review

We review a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6) de novo. Woods v. Wells Fargo Bank, N.A., 733 F.3d 349, 353 (1st Cir. 2013). That is, we accept the facts pleaded in the complaint as true to determine whether the plaintiff has stated a plausible claim for relief. Ocasio-Hernández, 640 F.3d at 12-13; Méndez Internet Mgmt. Servs., Inc. v. Banco Santander de Puerto Rico, 621 F.3d 10, 12 (1st Cir. 2010).

---

[7] While the complaint seeks relief under various subsections of RICO, including the conspiracy provision, subsection (d), the district court only examined Home Orthopedics' RICO claim under 18 U.S.C. § 1962(c), dubbed "substantive" RICO. Because Home Orthopedics does the same in its opening brief, and does not otherwise dispute the district court's disregard of the claims brought under 18 U.S.C. §§ 1962(b) and (d), we will follow suit and analyze Home Orthopedics' claim under only subsection (c).

-11-

## The Elements of a RICO Claim

RICO, the Racketeer Influenced and Corrupt Organizations Act, is a statute that Congress enacted as a tool in the federal government's "war against organized crime," <u>United States</u> v. <u>Turkette</u>, 452 U.S. 576, 587 (1981), to help combat "enduring criminal conduct," <u>Libertad</u> v. <u>Welch</u>, 53 F.3d 428, 445 (1st Cir. 1995). In addition to allowing the criminal prosecution of RICO violators, <u>see</u> 18 U.S.C. § 1962, the statute's expansive reach also provides a generous private right of action -- successful plaintiffs are entitled to triple damages if they can prove they were "injured in [their] business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c).

Against that backdrop, we start our analysis by laying out the building blocks of a civil RICO claim.

The RICO statute makes it:

> unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). To state a civil RICO claim, then, a plaintiff must allege: "(1) conduct, (2) of an enterprise, (3) through [either] a pattern . . . of racketeering activity," <u>Kenda Corp.</u> v. <u>Pot O'Gold Money Leagues, Inc.</u>, 329 F.3d 216, 233 (1st Cir. 2003)

(quotations omitted), or "a single collection of an unlawful debt," United States v. Weiner, 3 F.3d 17, 24 (1st Cir. 1993).

We turn our attention to the third element -- specifically, whether Home Orthopedics has sufficiently alleged a pattern of racketeering activity. As we explain below, we agree with the district court that Home Orthopedics has not sufficiently alleged a RICO pattern, and thus, its RICO claim fails.[8]

### Pattern of Racketeering Under RICO

RICO specifically enumerates what kinds of illegal acts count as "racketeering," and includes in that category of crimes extortion and mail and wire fraud. See 18 U.S.C. § 1961(1). To establish a "pattern," the statute requires a plaintiff to show that at least two acts of racketeering occurred within ten years of each other. 18 U.S.C. § 1961(5).

The Supreme Court has additionally required that "'the racketeering predicates [be] related, and that they amount to or pose a threat of continued criminal activity.'" Giuliano v. Fulton, 399 F.3d 381, 386-87 (1st Cir. 2005) (quoting H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989)). The latter requirement is called the "continuity" requirement. Giuliano, 399 F. 3d at 386-87

---

[8] Home Orthopedics suggests in its opening brief that Linares and Pino's attempts to collect the consulting fees constituted "collection of an unlawful debt," making no pattern of racketeering activity necessary to satisfy the third RICO element. This suggestion is without merit, however, because RICO limits "unlawful debt" to illegal gambling debt and "usurious" loans, see 18 U.S.C. § 1961(6), and no such debts are alleged here.

(citing <u>Efron</u> v. <u>Embassy Suites (P.R.), Inc.</u>, 223 F.3d 12, 15 (1st Cir. 2000)).

As the language of <u>H.J. Inc.</u> indicates, the Supreme Court held that a plaintiff can show continuity in one of two ways. Under the "closed" approach, a plaintiff would have to prove a "closed period of repeated conduct" that "amounted to . . . continued criminal activity." 492 U.S. at 237, 241. Alternatively, under the "open-ended" approach, a plaintiff could satisfy the continuity requirement by showing "past conduct that by its nature projects into the future with a threat of repetition." <u>Id.</u>

In the instant case, the appellant's opening brief does not specify whether Home Orthopedics intended to show a pattern of racketeering through closed continuity, open-ended continuity, or both. The RICO case statement was also of no help in illuminating which type of pattern Home Orthopedics intended to prove; the district court specifically asked Home Orthopedics to "[d]escribe in detail the pattern of racketeering activity . . . alleged for each R.I.C.O. claim," but rather than actually describing the pattern, Home Orthopedics directed the court to fifty-six paragraphs of the complaint. We were no more enlightened after re-reading that portion of the complaint.

As we have stated time and again, litigants must provide meat on the bones of their arguments if they expect us to seriously entertain them. <u>See</u> <u>Rodríquez</u> v. <u>Municipality of San Juan</u>, 659 F.3d

168, 176 (1st Cir. 2011).  In this situation, though, we will not dwell on whether Home Orthopedics' terse treatment of the "pattern" prong sufficed to preserve its appellate rights because in any case, Home Orthopedics' pleaded allegations do not make the stuff of either closed or open-ended continuity.

## Closed Continuity

While Home Orthopedics does not address this argument, the defendants assert that closed continuity cannot be established here because Home Orthopedics has only alleged "a single narrow scheme to defraud a single victim."  We agree.

Because RICO was intended to attack "long-term criminal conduct," "a closed-ended pattern sometimes can be established by examining only the number of alleged predicate acts and the duration of the alleged racketeering activity." Giuliano, 399 F.3d at 387; see also Efron, 223 F.3d at 15-16 (citing H.J. Inc., 492 U.S. at 240-41) (noting that the Supreme Court has placed emphasis on "the temporal focus of the 'continuity' requirement").  However, given that Congress had a "fairly flexible concept of a pattern in mind" when it drafted RICO, H.J. Inc., 492 U.S. at 239, both the Supreme Court and this court have declined to spell out specifically how many predicate acts, or how long the racketeering has to endure, for a plaintiff to satisfactorily allege the pattern requirement.

But we have established some parameters.  We know, from the Supreme Court, that when a plaintiff has only alleged a few

-15-

predicate acts (i.e., "sporadic activity"), H.J. Inc., 492 U.S. at 239, or when the acts span only a "few weeks or months," closed continuity cannot be established, Efron, 223 F.3d at 17-18 (citing H.J. Inc., 492 U.S. at 242). At the other end of the spectrum, we have also said that "where the temporal duration of the alleged activity and the alleged number of predicate acts are so extensive that common sense compels a conclusion of continuity, closed-ended continuity should be found." Giuliano, 399 F.3d at 387 (citation and quotations omitted); see also, e.g., Fleet Credit Corp. v. Sion, 893 F.2d 441, 446-47 (1st Cir. 1990) (finding that ninety-five racketeering acts over a 4.5-year period was sufficient for closed continuity).

Other cases, though, fall somewhere in the middle because the "duration and extensiveness of the alleged conduct does not easily resolve the issue." Giuliano, 399 F.3d at 387. In those squishier cases, we look to other "indicia of continuity," id.; for instance, whether the defendants were involved in multiple schemes, as opposed to "one scheme with a singular objective"; whether the scheme affected many people, or only a "closed group of targeted victims"; and whether the scheme had the potential to last indefinitely, instead of having a "finite nature." Efron, 223 F.3d at 18-19. While these specific factors are ones we have considered in the past, at the end of the day, we just take a "natural and commonsense approach to RICO's pattern element," id. at 18 (citing

-16-

H.J. Inc., 492 U.S. at 237), to determine whether the specific fact pattern of the case before us suggests the "kind of broad or ongoing criminal behavior at which the RICO statute was aimed," Efron, 223 F.3d at 18.

We find that Home Orthopedics' allegations do not fit the bill. Even assuming (without deciding) that the complaint alleges more than sporadic activity, the predicate acts alleged are certainly not "so extensive that common sense compels a conclusion of continuity." Giuliano, 399 F.3d at 387; cf. H.J. Inc., 492 U.S. at 250; Fleet Credit Corp., 893 F.2d at 446-47. We have "consistently declined to find continuity where the RICO claim concerns a single, narrow scheme targeting few victims." Giuliano, 399 F.3d at 390. And that is exactly what Home Orthopedics has alleged. It contends that the defendants engaged in unlawful conduct for the purpose of accomplishing a singular, narrow goal -- to help Raúl collect from Home Orthopedics the consulting fees he believed he was owed from 2005 and 2006 under the terms of their 2005 agreement. Thus, even if the defendants committed numerous crimes to try to collect this specific sum of money, all of these unlawful acts "have their origin in," González-Morales v. Hernández-Arencibia, 221 F.3d 45, 52 (1st Cir. 2000), a single "event," Efron, 223 F.3d at 19, or single "transaction," González-Morales, 221 F.3d at 52 -- the signing of the 2005 agreement. See id. ("Courts have consistently held that a single episode does not constitute a

-17-

pattern, even if that single episode involves behavior that amounts to several crimes (for example, several unlawful mailings).") (quotations omitted).  As we have said before in the context of closed continuity, "[o]ur own precedent firmly rejects RICO liability where the alleged racketeering acts . . ., taken together, . . . comprise a single effort to facilitate a single financial endeavor."  Efron, 223 F.3d at 19 (quoting Schultz v. R.I. Hosp. Trust Nat'l Bank, N.A., 94 F.3d 721, 732 (1st Cir. 1996)) (quotations omitted).  Here, the defendants' "single financial endeavor" was to help Raúl collect a specific amount of money under the terms of a single contract.[9]  See also Apparel Art Int'l, Inc. v. Jacobson, 967 F.2d 720, 723 (1st Cir. 1992) (holding that "several instances of criminal behavior," including making bribes and false statements, were "appropriately characterized as separate parts of a single criminal episode" because they "comprise[d] a single effort to obtain (and to keep) one . . . Defense Department contract").  That the defendants in this case sought to accomplish a specific, narrow mission -- which stemmed from a single, discernible event -- clearly cuts against a conclusion that Home Orthopedics has sufficiently alleged a closed pattern.

---

[9] To the extent Home Orthopedics intended to assert that the defendants were also scheming to take the HMO's business away from Home Orthopedics, that point is not made clear in the complaint, RICO case statement, or briefing.  It is, therefore, waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

-18-

Looking at some of the other factors, Home Orthopedics was, moreover, the only "targeted victim" of the defendants' actions.[10]  And the nature of the defendants' conduct is finite. According to the complaint, Raúl sought only to collect the 2005-2006 fees; the complaint makes no indication that once he received those percentage fees, the allegedly extortionate conduct would continue.

Thus, our common sense dictates that where, as here, "a closed-ended series of predicate acts . . . constitute[s] a single scheme to accomplish one discrete goal, directed at one individual with no potential to extend to other persons or entities," Efron, 223 F.3d at 19 (quoting Sil-Flo, Inc. v. SFHC, Inc., 917 F.2d 1507, 1516 (10th Cir. 1990)) (quotations omitted), RICO liability cannot attach under a theory of a closed pattern of racketeering.

Next, we explain why Home Orthopedics' complaint likewise fails under a theory of open-ended continuity.

Open-Ended Continuity

As we noted above, even in the absence of closed continuity, a plaintiff can still demonstrate a "pattern" by showing a "threat of" future criminal activity -- that is, "a realistic prospect of continuity over an open-ended period yet to come."

---

[10] While Home Orthopedics contends in its brief (in a one-sentence footnote) that Raúl used the lie about having an exclusive deal with the HMO "to take out of business hundreds of service providers of durable medical equipment," Home Orthopedics did not allege such in the complaint.

<u>Feinstein</u> v. <u>Resolution Trust Corp.</u>, 942 F.2d 34, 45 (1st Cir. 1991). "This approach necessitates a showing that the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future [or] . . . are part of an ongoing entity's regular way of doing business." <u>Id.</u> (quotations omitted).

We find that an open-ended pattern would fail here for largely the same reasons that a closed pattern would. Neither Home Orthopedics' complaint nor briefing provide any indication that were Raúl to receive his fees from Home Orthopedics, the "scheme" to collect money would continue into the indefinite future. To the extent Home Orthopedics intended to show that the ongoing Puerto Rico lawsuit Raúl initiated against Home Orthopedics in 2009 constitutes indefiniteness, this argument easily fails. As we stated in <u>González-Morales</u>, when the "filing of frivolous [law]suits" has its origin in the execution of a single contract, "the fact that . . . local court suits are still pending does not constitute long-term conduct demonstrating a threat of future activity." 221 F.3d at 51-52. Lawsuits, by their very nature, are not indefinite, <u>see</u> <u>Feinstein</u>, 942 F.2d at 45 -- once one side prevails (or the parties settle), the case is over. Nor has Home Orthopedics attempted to show that the defendants' alleged racketeering acts were part of their regular way of doing business.

For these reasons, we find that Home Orthopedics has not sufficiently alleged a "pattern of racketeering activity" necessary

to sustain its RICO claim.  Here, "[a]t most, what has been alleged is a business deal gone sour" -- and that alone does not equate to a RICO violation.  González-Morales, 221 F.3d at 52 (quoting Sil-Flo, Inc., 917 F.2d at 1516) (quotations omitted).

## Motions to Amend/Conduct Discovery

However perfunctorily, Home Orthopedics also argues that the district court erred in denying its motion to conduct limited discovery and then to amend its complaint for a second time.  We review a district court's denial of a motion to file an amended complaint for abuse of discretion.  Glassman v. Computervision Corp., 90 F.3d 617, 622 (1st Cir. 1996).  We "defer to the district court's hands-on judgment so long as the record evinces an adequate reason for the denial."  Torres-Álamo v. Puerto Rico, 502 F.3d 20, 25 (1st Cir. 2007) (quotations omitted).  Legitimate reasons for denying a motion to amend include "undue delay, bad faith, futility and the absence of due diligence on the movant's part."  Id. (citation and quotations omitted).

In denying the motion to amend, the district court adopted the magistrate judge's reasoning that an additional amendment would "do little more than further waste the time of the courts and litigants."  While neither the magistrate nor district court judges used the term specifically, they essentially ruled that allowing another amendment would be futile.  See Glassman, 90 F.3d at 623

-21-

("'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted.").

The district court did not abuse its discretion in so ruling. While Home Orthopedics asserts that "further details of [the defendants'] associations, their illegalities, [and] their scheme to illegally harm [Home Orthopedics][] are only in possession of defendants themselves," we do not see -- and Home Orthopedics does not attempt to explain -- what additional information from the defendants would conceivably help nudge the facts of this case into a "pattern of racketeering." To the extent Home Orthopedics relies on Pruell v. Caritas Christi, 678 F.3d 10 (1st Cir. 2012), where we remanded to give the plaintiffs an opportunity to amend their complaint, we specifically noted in Pruell that "some latitude has to be allowed where a claim looks plausible based on what is known." 678 F.3d at 15 (emphasis added). Such is not the case here.

Home Orthopedics also relies on New Eng. Data Servs., Inc. v. Becher, 829 F.2d 286 (1st Cir. 1987), to argue that it should have been permitted to conduct some discovery before its claims were dismissed. But, as the district court noted, Becher is inapposite; there, we simply held that the plaintiffs should have been permitted discovery to flesh out their fraud allegations, which were subject to a heightened pleading requirement under Rule 9(b). See 829 F.2d at 292. Given that Home Orthopedics offers no other law (or reasoning) as to why it should have been permitted discovery even

-22-

though its complaint failed to state a claim, we find that its generic argument is waived for lack of development.  See <u>Zannino</u>, 895 F.2d at 17.

## CONCLUSION

For the reasons discussed above, we **<u>affirm</u>** the district court's judgment.  Appellees are awarded costs.